214 So.2d 579 (1968)
STATE of Mississippi, for the Use and Benefit of Evelyn Taylor Richardson, Admrx. of the Estate of Billy Joe Richardson, Deceased, for the Benefit of Rhonda Rena Richardson, a Minor, Billy Joe Richardson, Jr., a Minor, and Evelyn Taylor Richardson
v.
Homer EDGEWORTH, James L. Barlow, et al.
No. 44959.
Supreme Court of Mississippi.
September 30, 1968.
*581 Young, Young & Scanlon, Jackson, for appellants.
E. Michael Marks, Ernest L. Shelton, W.E. Gore, Jr., Robert G. Nichols, Jr., John R. Countiss, III, Fred Rucker, Clarence R. Scales, N. Craig Brigtsen, Jr., Jackson, for appellees.
ETHRIDGE, Chief Justice.
This suit was brought in the Circuit Court for the First Judicial District of Hinds County by Evelyn Taylor Richardson, administratrix of the estate of Billy Joe Richardson, deceased (appellant), against two justices of the peace of Hinds County, Homer Edgeworth and James L. Barlow, their deputy sheriffs and surety companies (appellees), for the wrongful death of Richardson by suicide, allegedly caused by the intentional abuse of legal process by the defendants. At the close of plaintiffs' case, the circuit court gave a directed verdict for defendants. We reverse and remand the case to the circuit court for a full trial on the merits, and hold that the testimony for plaintiffs, if accepted by the jury, shows that: (1) Defendants intentionally abused the criminal processes of the justice of the peace courts for the purpose of inflicting upon Richardson sufficient emotional distress to cause him to pay a civil debt and the court costs collected by defendants. (2) These intentional torts were substantial factors producing the single result of Richardson committing suicide while under an irresistible impulse, and each are jointly and severally liable.

I.
Since the trial court sustained defendants' motion for a directed verdict, plaintiffs' evidence must be treated as proving every fact favorable to their case, either by direct evidence or by reasonable inference therefrom.
Billy Joe Richardson was born in 1943 in South Carolina. During his childhood his parents lived in several places in Mississippi, and in January 1962, Richardson dropped out of high school while in the eleventh grade. He had no further education. In 1963 he married his first wife, and in March 1964 a daughter was born to them. In May 1964 he was arrested on a criminal bad check charge, and was sentenced to a six months' term in the county jail in Coahoma County, Mississippi, where he performed labor at the county hospital. About two weeks before the end of his term, Richardson escaped and went to Memphis, where he was arrested the next day and returned to serve the balance of his term. While he was in jail, his first wife obtained a divorce from him.
In January 1966 Richardson married Evelyn Taylor, his surviving widow, and in April 1966, they moved to Jackson, Mississippi, where he was employed by a car wash business, and Mrs. Richardson worked as a practical nurse at a hospital.
On July 6, 1966, at 11 p.m., Deputy Sheriff Albert Sullivan, who was attached to the office of Justice of the Peace James L. Barlow, went to the Richardson home and informed him that he had three criminal warrants for his arrest. The first, issued by Barlow, stemmed from a criminal affidavit signed in blank by Mrs. Flowers, for Flowers Minnow Farm, for collection of a $10 check drawn by Richardson. Mrs. Flowers had called Barlow's office, informing him that she had a check for collection. A constable picked it up and had her sign the blank criminal affidavit, *582 without appearing before Barlow. The second warrant resulted from a criminal affidavit signed on behalf of a cleaning establishment by Mrs. Lelia Smith, for the collection of a $3.00 check drawn by Richardson. She also did not sign the affidavit before Barlow. The third warrant was based upon an affidavit signed for a store by H.L. Duke for collection of a $1.00 check drawn by Richardson. Once again, the criminal affidavit was signed in blank and without Barlow's presence. See Miss.Code 1942 Annot. § 2153 (Supp. 1966) (false pretense, "bad check" law).
Sullivan served the three criminal warrants on Richardson, and, since neither Billy Joe nor his wife had the money necessary to pay the checks, costs and fines, Sullivan took them in his car to the office of Barlow, where Billy Joe was allowed to call an officer of his employer, Mississippi Bearings, Inc., who subsequently loaned him the money to pay the demands made by Sullivan. Sullivan drove the Richardsons from Barlow's office to the office of the employer, where the loan was made and the money was paid. Barlow issued a receipt showing that he had received $107 from Mississippi Bearings, Inc. The receipt listed three numbers corresponding with the criminal docket and page number of each of the above items. These pages on Barlow's justice court docket revealed that for each warrant Richardson had been required to pay a fine of $25.00, an officer's fee of $4.00, and mileage for conveying a person to jail of $2.00, plus the amount of each check involved. From the $107.00 collected from Richardson, Barlow paid Mrs. Flowers $10.00, the store $1.00, and the cleaners $3.00, the amounts of the respective checks. Sullivan received three mileage payments of $2.00 each, even though he had served all three warrants on one trip and had not taken Richardson to jail. Sullivan made no return on two of these bench warrants.
A few days later, written notice was received by the Richardsons at their home advising them to come to Barlow's office. On July 11, 1967, they went to his office and were told to pay two checks. Richardson remained at Barlow's office while Mrs. Richardson sought to borrow the money from a physician under whom she worked at the hospital. Had she failed, her husband would have been taken to jail. Upon signing one criminal affidavit, the affiant, Bob Rainer, had told Barlow that he wanted a $5.21 check written by Richardson collected. As a result of this affidavit, Barlow required Richardson to pay a $25.00 fine, $4.00 officer's fee, and the amount of the check ($5.21), or a total of $34.21. From the money collected, Rainer received $5.21 and Sullivan $4.00 as an officer's fee even though he had not taken Richardson to jail or to Barlow's office.
On a third occasion, the Richardsons found another written notice at their home to appear before Justice of the Peace Barlow as to charges on three checks. Mrs. Richardson asked her mother to send money, and she sent $150.00. On July 26, 1966, the Richardsons appeared at Barlow's office and were informed that he had four checks for collection. Richardson was given the alternative of paying them or going to jail. The first of these four checks was picked up from J.E. Farmer at his barber shop by George Warren, another deputy sheriff working out of Barlow's office. This check, made by Richardson for $2.25, was taken to Barlow's office, where, without authority from Farmer, Sullivan signed a criminal affidavit for its collection. Richardson was required to pay a $25.00 fine, $4.00 officer's fee, $2.00 mileage, and the amount of the check, $2.25.
The collection efforts on the second check stemmed from a criminal affidavit by Mrs. Miller on behalf of a hardware company, to collect a $5.00 Richardson check. The third check was given to Wayne Spradling's Service Station by Richardson in the amount of $5.00. A warrant was issued by Barlow on a criminal affidavit which had not been signed by Spradling. It was in blank, but Barlow notarized it anyway. The check had been *583 turned over to Barlow's other deputy, George Warren, and Spradling did not appear before Barlow to sign it. As on other occasions, Richardson was required to pay a $25.00 fine, $4.00 officer's fee, $2.00 mileage, plus the amount of the check, in this instance $5.00. No return was made on the special bench warrant issued for the arrest of Richardson. The fourth check in this group was turned over to Barlow by Mrs. Drury on behalf of a service station. Again, no return was made on the special bench warrant. As in other cases, Richardson was required to pay a $25.00 fine, $4.00 officer's fee, $2.00 mileage, and the amount of the check, $4.75.
From the $141.00 collected from Richardson, Barlow paid Farmer $2.25, the hardware company $5.00, one service station $5.00, and the other $4.75. These payments were the exact amounts owed these persons on Richardson's checks. In addition to four fines of $25.00 each, Barlow collected $16.00 as constable costs and $8.00 mileage. This money was divided equally between deputy sheriffs Sullivan, Warren and Fortenberry, even though none of them actually served any of the four warrants or carried Richardson to jail or to Barlow's office. Although Barlow had handled the charges against Richardson on eight affidavits, the fines and costs were always the same, and to them were added the amounts of the checks, which Barlow disbursed to the respective payees.
In the meantime, economic pressures on the Richardson family became very intense. As a result of the July 6 incident, when Billy Joe had to borrow money from his employer, the employer fired him. Billy Joe got a job as a commission salesman, but was earning practically nothing. Mrs. Richardson had been working as a practical nurse since May, but earned only $50.00 a week. Apparently the family had been living on that income for several weeks. Mrs. Richardson's two children by an earlier marriage were living with them. Because of all of the fines which they had had to pay, and their efforts in picking up other checks, they had been unable to pay their electricity bill, and the electricity had been turned off a day or so before July 28. According to the calculations of Mrs. Richardson and her husband, they had not overdrawn his checking account. Four night deposits which they had made had not been credited to his account. All of these factors placed them in such a dire financial condition that they had had difficulty buying food.
On July 28, 1966, around 1:30 a.m., Deputy Sheriffs John Grant and Harvey Ray awakened Mr. and Mrs. Richardson. Grant informed them that he was a deputy sheriff, working out of Justice of the Peace Edgeworth's office, and that he had two warrants for the arrest of Billy Joe. The first was issued from a criminal affidavit signed by Mrs. Mitchell on behalf of a grocery store. It was presented to her at the store, where she signed it in blank, not before Edgeworth, and gave it to Deputy Grant along with Richardson's check. On several prior occasions she had signed blank affidavits for the collection of checks by Edgeworth, and in this particular instance, her intention was the same. Mrs. Mitchell testified that Justice of the Peace Edgeworth had called her by telephone before the trial and told her that, if she did not testify that she had signed the affidavits in his office, he would make a liar out of her. Nevertheless, she said that she did not sign the affidavit before him.
The second warrant was issued as the result of a criminal affidavit filed by Charles Glover on behalf of a grocery store, with the only notation on the back being the word "dead."
In the dark of this early morning hour, when Grant told the Richardsons that he had two warrants for Billy Joe's arrest, Mrs. Richardson, who was pregnant, fainted. Grant told him that $70 would be required *584 to pay the two checks. This demand was made on the following basis:

 Total of two checks $10.00
 Two fines of $25.00 each 50.00
 Two court costs of $4.00 each 8.00
 Mileage charge 2.00
 ______
 Total $70.00

Billy Joe asked Grant if he could try to borrow the money and Grant permitted him to do so. He went across the street to the home of a neighbor, Bennie Covington. He entered the Covington house and stayed a few minutes, and upon his return with Covington, Richardson told Grant that Covington was unable to loan him the money. Covington testified that Grant told Billy Joe that "he had to take him to jail or get whatever he had come after." He asked, and Grant gave him permission to go to the Purvis home next door. Richardson knocked on the door but received no answer. Billy Joe then asked Grant if he could go in his house to get some socks. With permission, Richardson went in the house, and after a short interval of time there was a gunshot. Mrs. Richardson and Grant ran inside and found Billy Joe lying on his back across the bed, without shoes and with his feet on the floor. There was a large wound in the pit of his stomach, and a shotgun was lying on the floor beside the bed. He died within a few minutes. No one was seen in or near or running from the house. The only persons in it were the children who were asleep.
Dr. Oscar E. Hubbard, a professor of psychiatry at the University of Mississippi Medical School who had many years of experience in the practice of psychiatry, testified for the plaintiffs. A detailed hypothetical question was propounded to him. He stated that it was his opinion, with reasonable medical certainty, that the criminal charges brought by Barlow and Edgeworth and the arrests by Sullivan and Grant proximately caused or contributed to Richardson's suicide. Dr. Hubbard further stated that Richardson had a psychoneurotic disorder which consisted of a phobic concern about being sent back to jail. Upon Grant's demand Billy Joe was caught between being jailed once more, or borrowing the necessary money. After his frantic but fruitless search for money, he found himself getting closer and closer to being locked up, with all of his avenues of escape closed. Thus, Dr. Hubbard said, Richardson was seized by an irresistible or uncontrollable fear, and without being able to reason with himself as to the consequences, he killed himself. His fear of prison under these pressing emotional circumstances manifested itself as an uncontrollable impulse. Dr. Hubbard thought that it was under this mounting pressure from his unreasoning fear of having to return to jail, that Richardson panicked and impulsively killed himself. In short, he had an uncontrollable impulse to commit suicide which must have arisen at the approximate time Richardson returned to his room and committed the act. Dr. Hubbard thought that the actions of Barlow and Edgeworth and the deputies contributed to and were causes of the uncontrollable impulse and resulting suicide.
At the close of plaintiffs' case the circuit judge sustained the motion of defendants for a directed verdict. However, he concluded that the two justices of the peace had permitted and perhaps encouraged the use of criminal processes of the courts solely for the collection of civil debts. There were many irregularities practiced by defendants, including: (1) Permitting people to sign criminal affidavits without advising them of the criminal nature of the documents; (2) failing to require affiants to appear before the justice of the peace for sworn statements; (3) permitting criminal affidavits to be signed in blank; (4) charging excessive mileage; (5) soliciting collection of accounts, through their deputy sheriffs and constables; and (6) using the criminal processes for the collection of civil debts alone.
The trial court sustained appellees' motion for a directed verdict on three grounds: First, plaintiffs failed to overcome the presumption against suicide; second, *585 suicide is not reasonably foreseeable; and, third, defendants are not liable in wrongful accusation or arrest cases which result in suicide.

II.
The trial court did not err in admitting the testimony of Dr. Hubbard in answer to the hypothetical question propounded by plaintiffs' counsel. The hypothetical question outlined in detail the facts set forth above, and stated: "He entered the house again and lay on his bed and shot himself in the stomach with a shotgun." Appellees have cross-appealed as to the doctor's testimony. They contend that it was a question for the jury as to whether the wound was self-inflicted. There is no direct testimony by an eyewitness that Billy Joe shot himself.
However, facts which are not supported by direct testimony, but which are readily inferable from the evidence, may be embodied in a hypothetical question to an expert witness. Rational inferences may be drawn from the record to form the basis for the question. The interrogator may form his question upon any theory which can reasonably be deduced from the evidence. Thus a hypothetical question may properly include as a fact that which may reasonably be inferred from the direct and circumstantial evidence. McCormick on Evidence, § 14 (1954); 2 Wigmore on Evidence, § 682 at 805 (3d ed. 1940); see Prewitt v. State, 106 Miss. 82, 63 So. 330, 6 A.L.R. 1476 (1913). In the instant case and on this record it is almost an unavoidable conclusion that Billy Joe committed suicide. A contrary version would have to be based on the speculation and conjecture that it was an accident. All of the evidence before us points to a suicide.
Moreover, the presumption that a person will not destroy himself by suicide is rebuttable. Plaintiffs' evidence, if accepted by the jury, was ample to overcome any presumption against suicide and to warrant a jury finding that Richardson killed himself. Jefferson Standard Life Ins. Co. v. Jefcoats, 164 Miss. 659, 143 So. 842 (1932); Life & Casualty Ins. Co. of Tenn. v. Andrews, 149 Miss. 306, 115 So. 548 (1928); Massachusetts Protective Ass'n v. Cranford, 137 Miss. 876, 102 So. 171 (1924); see 31A C.J.S. Evidence § 135 (1964). Further, the presumption against suicide does not exist where it appears that decedent was insane. Annot. 112 A.L.R. 1278 (1938); 29 Am.Jur.2d Evidence § 218 (1967); 31A C.J.S. Evidence § 135 (1964).
The circuit court properly sustained objections to plaintiffs' offer in evidence of the coroner's report. Nehi Bottling Co. of Ellisville v. Jefferson, 226 Miss. 586, 84 So.2d 684 (1956).
The primary count in the declaration charged that defendants were jointly and severally guilty of abuse of process. The allegation of conspiracy between the parties was surplusage, not necessary to the suit. Wilkerson v. Randall, 254 Miss. 546, 180 So.2d 303 (1965); Jessup v. Reynolds, 208 Miss. 50, 43 So.2d 753 (1949); see also 16 Am.Jur.2d Conspiracy § 62 (1964).
Appellees also argue that the declaration does not sufficiently charge a cause of action. Although it could have been more precise, it averred that "as a proximate result of the harassment of all the criminal warrants against him by the defendants in this case, Richardson was in a deep state of depression and anxiety. To avoid further harassment, oppression, and arrest, Richardson loaded a shotgun and shot himself in the stomach." The statute requires only that a declaration contain a statement of facts constituting a cause of action in ordinary language, and "if it contains sufficient matter of substance for the court to proceed upon the merits of the cause, it shall be sufficient * * *." Miss.Code 1942 Ann. § 1464 (1956). The declaration was sufficient. Wilkerson v. Randall, supra.
*586 Appellees argue that if Richardson's death was a suicide, plaintiffs' action does not survive under the wrongful death statute. Miss.Code 1942 Ann. § 1453 (Supp. 1966). They contend that aiding or assisting one in taking his own life is a crime [Miss.Code 1942 Ann. § 2375 (1956)]; and that Mississippi has not abrogated the common law by eliminating the commission of suicide as a criminal offense, citing Code section 2560, which makes every offense not provided by statute "indictable as heretofore at common law." But see Schulman, Suicide and Suicide Prevention: A Legal Analysis, 54 A.B.A.J. 855 (1968). However, we do not reach that question, since we hold that the plaintiffs' evidence makes a jury issue as to whether as a result of defendants' intentional torts, Richardson acted under an irresistible impulse and committed suicide. If Richardson had lived he would have had a good cause of action against defendants, and under the wrongful death statute, the widow and children of decedent are entitled to recover the damages which decedent could have recovered if he had lived. Moreover, this issue was not raised by the defendants in the trial court. It is made here for the first time. Code section 1453 applies to any "wrongful or negligent act or omission," and covers any wrongful act whether negligent or intentional. See Speiser, Recovery for Wrongful Death § 2:1 (1966).

III.
Recovery in wrongful death actions has been denied in several cases where the decedent committed suicide, on the ground that the suicide was an unforeseeable, intervening cause of death. Salsedo v. Palmer, 278 F. 92 (2d Cir.1921), 23 A.L.R. 1262 (1923); Stevens v. Steadman, 140 Ga. 680, 79 S.E. 564, 47 L.R.A.,N.S., 1009 (1913); Waas v. Ashland Day and Night Bank, 201 Ky. 469, 257 S.W. 29, 35 A.L.R. 1441 (1923); Jones v. Stewart, 183 Tenn. 176, 191 S.W.2d 439 (1946); Lancaster v. Montesi, 216 Tenn. 50, 390 S.W.2d 217 (1965); Annot., 11 A.L.R.2d 751 (1950). They reasoned that suicide is a new and independent agency which breaks the causal connection between the wrongful act and the death. We decline to follow those cases under the present facts.
The two justices of the peace and their deputies committed intentional torts  the abuse of process. Its elements are that the defendants made an illegal, improper, perverted use of the process, they had an ulterior motive or purpose in doing so, and damages resulted to plaintiffs from the irregularities. 1 Am.Jur.2d Abuse of Process § 4 (1962); see Fowler v. King, 254 Miss. 61, 179 So.2d 800 (1965); Port Distributing Corp. v. Mitchell, 247 Miss. 633, 157 So.2d 51 (1963); Harvill v. Tabor, 240 Miss. 750, 128 So.2d 863 (1961). Plaintiffs' evidence would support a jury finding that Richardson committed suicide while acting under an irresistible impulse in a moment of temporary mental derangement substantially caused by these acts. Where a defendant has committed an intentional tort, questions of whether the deceased was induced to take his life by an irresistible impulse and whether the intentional tort was a substantial factor in causing the suicide are ordinarily issues for the jury. Cauverien v. De Metz, 20 Misc.2d 144, 188 N.Y.S.2d 627 (1959). Since plaintiffs' evidence supports those factors, we do not reach the additional issues considered in Tate v. Canonica, which allowed recovery for suicide caused by an intentional tort if the mental stress which the defendant inflicted was a substantial cause of the suicide, even if the decedent was aware of his act and was not responding to an irresistible impulse. Tate v. Canonica, 180 Cal. App.2d 898, 5 Cal. Rptr. 28 (1960); see Note, 30 N.A.C.C.A.L.J. 162 (1964).
In short, the defendants' intentional conduct is a legal cause of harm to plaintiffs if their individual acts were substantial factors in bringing about the harm. Restatement, Torts §§ 279, 280 (1938); Restatement, Torts (Second) § 455 (1965). *587 We hold that where the suicide is committed in response to an uncontrollable impulse, recovery may be had if the mental state of deceased was substantially caused by the defendants' intentional wrongful acts, and whether they were substantial factors in bringing about the death by suicide may be issues for the jury. Cauverien v. De Metz, supra; Speiser, Recovery for Wrongful Death § 2:7 (1966); see also Prosser, Torts 302 (3d ed. 1964). A higher degree of responsibility is imposed upon a wrongdoer whose conduct was intended to cause harm than upon one whose conduct was negligent. Lyons v. Zale Jewelry Co., 246 Miss. 139, 150 So.2d 154 (1963) (emotional disturbances caused by verbal abuse actionable); Bauer, The Degree of Moral Fault as Affecting Defendant Liability, 81 U.Pa.L.Rev. 586 (1933).
However, in contrast, Orcutt v. Spokane County, 58 Wash.2d 846, 364 P.2d 1102 (1961), applied the irresistible impulse rule to create liability for negligent acts or omissions leading to suicide. See Rheingold, Negligence Liability for Suicide: The Contribution of Dynamic Psychiatry, 7 Plaintiff's Advocate 50 (1963).
A case related to the present one is Prentiss Truck & Tractor Company v. Spencer, 228 Miss. 66, 87 So.2d 272 (1956), in which this Court affirmed an award of workmen's compensation, death benefits for the death by suicide of an employee two years after he sustained a compensable injury to his back. It was an issue of fact as to whether at the time the employee took his life he was suffering "from a mental disturbance of depressive insanity and did not have the mental capacity to determine the consequences of his act." If he took his own life through an uncontrollable impulse and without conscious volition to cause death, and the mental condition was caused by the injury, the death was compensable.
Justice of the Peace Barlow and his deputy Sullivan were the first actors who committed the intentional tort of abuse of process. Justice of the Peace Edgeworth and his deputy Grant were the second and final actors committing a similar intentional tort. Thus appellees argue that Blizzard v. Fitzsimmons, 193 Miss. 484, 10 So.2d 343 (1942), noted in 15 Miss.L.J. 226 (1943), is relevant and controlling. In Blizzard, the plaintiff, a healthy and intelligent nine-year-old boy, went to defendant's public skating rink, paid his admission fee, put on a pair of skates and ventured out on the floor. He had never skated before, and in his determined and persistent effort to master the skill, he fell some forty to fifty times. His falls came in close succession, and he never succeeded in taking more than two or three steps without falling. After suffering a long succession of falls, the plaintiff began to cry and one of defendant's agents came and helped him off the floor. As a result of the repeated falls, he underwent surgery on his hip, and became permanently crippled. The Court held that defendant could not be held liable for the falls which occurred before a reasonable degree of watchfulness would have disclosed the total inability of plaintiff to skate unaided, and the probability that his persistent efforts in that regard would result in his injuries. After that time, defendant was negligent. Nevertheless, the Court held for defendant, reasoning that "consecutive wrongs done by independent agents cannot be conjoined to increase or enlarge the responsibilities of one of them." It was said that a defendant could not be held liable for the whole of a series of consecutive, and not concurrent, happenings when he is liable, if at all, only for a part, and that there was a single indivisible result, incapable of apportionment.
Since Blizzard is distinguishable, we do not need to reconsider at this time the validity of that decision. In the instant case, the consecutive wrongs of Barlow and Sullivan, and then Edgeworth and Grant, were not negligent but intentional torts. The jury would be justified in finding that both of them contributed to the *588 delirium or insanity which made it impossible for Richardson to resist an impulse caused by that condition depriving him of his capacity to govern his conduct in accordance with reason. The pertinent rule is well stated in Prosser, The Law of Torts § 42, at 250-251 (3d ed. 1964):
Certain results, by their very nature, are obviously incapable of any logical, reasonable, or practical division. Death is such a result, and so is a broken leg or any single wound, the destruction of a house by fire, or the sinking of a barge. No ingenuity can suggest anything more than a purely arbitrary apportionment of such harm. Where two or more causes combine to produce such a single result, incapable of any logical division, each may be a substantial factor in bringing about the loss, and if so, each must be charged with all of it. Here again the typical case is that of two vehicles which collide and injure a third person. The duties which are owed to the plaintiff by the defendants are separate, and may not be identical in character or scope, but entire liability rests upon the obvious fact that each has contributed to the single result, and that no rational division can be made.
Such entire liability is imposed both where some of the causes are innocent, as where a fire set by the defendant is carried by a wind, and where two or more of the causes are culpable. It is imposed where either cause would have been sufficient in itself to bring about the result, as in the case of merging fires which burn a building, and also where both were essential to the injury, as in the vehicle collision suggested above. It is not necessary that the misconduct of two defendants be simultaneous. One defendant may create a situation upon which the other may act later to cause the damage. One may leave combustible material, and the other set it afire; one may leave a hole in the street, and the other drive into it. Liability in such a case is not a matter of causation, but of the effect of the intervening agency upon culpability. If a defendant is liable at all, he will be liable for all the damage caused.
In other words, "each of two persons who is independently guilty of tortious conduct which is a substantial factor in causing a harm to another is liable for the entire harm, in the absence of a superseding cause." Restatement, Torts § 879 (1939). Cf. Hutto v. Kremer, 222 Miss. 374, 76 So.2d 204 (1954); 2 Harper and James, The Law of Torts § 20.3 (1956).
A justice of the peace is a judicial officer. A justice of the peace court is a judicial body. This officer and this court have no constitutional right or power to serve as a collection agency for creditors. A creditor may properly file his claim for a civil debt against the debtor in a justice of the peace court. But the justice of the peace serves only as a judicial officer to determine the validity of the claim. He is not a collection bureau. If he acts as a collection bureau, or if he utilizes the criminal processes of the court to collect a civil debt, he is perverting the functions of this small claims court and bringing disrespect upon the entire judicial process.
The judgment of the circuit court is reversed, and the case is remanded for a new trial.
Reversed and remanded.
RODGERS, PATTERSON, SMITH and ROBERTSON, JJ., concur.