Henrietta RANDLE et al., Plaintiffs,

v.

CONTINENTAL CASUALTY COMPANY, Defendant.

No. DC 76–94–K.

United States District Court, N. D. Mississippi, Delta Division.

Feb. 24, 1978.

Patricia A. Coats, Cleveland, Miss., for plaintiffs.

Kay Farese Luckett, Clarksdale, Miss., for defendant.

## MEMORANDUM OF DECISION

KEADY, Chief Judge.

In this diversity action, Henrietta Randle, a citizen of Bolivar County, Mississippi, plaintiff, sues Continental Casualty Company, an Illinois corporation, defendant, as the wife and beneficiary of Monroe Randle, in a $100,000 accidental death policy issued to Monroe Randle under a group plan as an employee of Baxter Laboratories. The case is in this court on removal from the Circuit Court of Bolivar County, Mississippi. Continental has denied liability asserting affirmatively that the insured did not die accidentally but as the result of suicide or an attempt thereat while sane, or by act of self-destruction while insane. Pretrial conference was conducted before the United States Magistrate at which extensive stipulations were made by the parties, and they are incorporated herein by reference. After evidentiary hearing conducted before this court, at which both sides offered evidence and the court having received arguments of counsel, the case is now ripe for decision. In accordance with the requirements of Rule 52(a), F.R.Civ.P., the court makes the following findings of fact and conclusions of law:

### I. *Findings of Fact*

Monroe Randle died on September 24, 1975, while a patient at the burn unit of the Delta Medical Center at Greenville, Mississippi; his death was the result of burns he had received while incarcerated in the Bolivar County jail on September 15, 1975. Randle, 21 years old, was married to the plaintiff and had two children. He had lived most of his life in Bolivar County, being reared by his aunt, Leola Johnson, from the time he was 12 or 13 years of age. He stayed with his aunt until he finished high school at age 16. Making good grades in high school, he attended Tougaloo College where he remained for only a short time and was sent home, on the Dean's recommendation, for needed rest. In June, 1972, he was picked up by the Columbus, Ohio police at the Greyhound Bus Station for disorderly conduct. Randle was, at that

time, admitted to the Columbus State Hospital where he was diagnosed as suffering from an acute schizophrenia episode, undifferentiated type. On June 22, 1972, upon testing, he was found to be very confused, impulsive, and frightened, with bizarre dissociated flights of ideas, with thought process "dissociated with high aspiration need and poor performance, highly ambiguous flights of ideas related with his masculine needs and false reasoning." Randle was noted to be hallucinating, hyperactive, pacing up and down the floor and refusing to keep his clothes on. After remaining in the Columbus Hospital for two weeks he was discharged to his aunt with recommendation for follow up care. Shortly thereafter, Randle voluntarily, and at his aunt's request, entered the Mississippi State Hospital where he remained from June 30 to August 4, 1972. He was diagnosed as schizophrenic, catatonic type, excited. At the Mississippi State Hospital Randle's condition was consistently observed to be bizarre, irrational and psychotic. He received 10 shock treatments which resulted in some improvement; he was placed on drugs, Stelazine and Mellaril. The hospital specialists advised that, to control his symptomatology, he should continue on this medication indefinitely.

Upon his release from Whitfield, Randle returned to live with his aunt, Leola Johnson, until some date in 1974 when he married plaintiff. Shortly thereafter they established their own household, which was approximately three blocks away from the aunt's residence. At some point in time, Randle became employed as a painter by Baxter Laboratories, working on a shift from 5 a. m. to 1:30 p.m. He first enrolled at Mississippi Valley State, then he transferred to Delta State, his classes lasting from sometime after 1:30 until 8 p. m. He attended Delta State five days a week. During this time two children had been born of the marriage.

Randle placed himself under the care of Dr. Arthur Lindsey, Jr. at Cleveland, who was familiar with his mental illness history and recommended that he continue indefinitely on the prescribed drugs. With regular medication, Randle was able to continue at his job and do his school work, although he did complain of the driving pace. Prior to September 15, Dr. Lindsey, or his associates, had seen Randle on various occasions. For example, Cleveland Hospital records show that on July 4, 1975, Randle reported in complaint of pains all over, in a very nervous condition. He was given an injection of 15 mg. valium and allowed to go home. On August 20, Randle was again in the Cleveland Hospital with a complaint of aching all over, having paranoid feelings. The attending physician, after obtaining a history of schizophrenia and Randle's prior hospitalizations, made a diagnosis of paranoid schizophrenia and administered a shot of 75 mg. Thorozine. Two days later Randle returned to the hospital on a complaint of nervousness, with a diagnosis of anxiety state; he again received an injection of drugs.

On August 12, 1975, the plaintiff had Randle arrested on a charge of disturbing the peace. Though plaintiff now denies that he physically attacked her, the court finds as a fact that Randle had been physically abusive to her, that he suffered delusions, was violent, confused and displayed aggressive tendencies. His behavior was so erratic that the plaintiff feared for the safety of herself and her children and left with the children to go to the aunt's house.

For some days prior to September 12, 1975, Randle had refused to continue on his prescribed medication and had resisted efforts to receive medical treatment. Based upon plaintiff's affidavit, Randle was arrested by the Cleveland City police and delivered to the county jail for incarceration. Randle had no shirt but was wearing only pants with belt and shoes. Upon the jailer's instruction, he emptied his pockets, placing on the counter top some medicine bottles. He was then placed in the group cell with approximately 25 or 30 other persons. He stayed in this bullpen for one or two days. The inmates in the large cell had access to matches and smoking materials. Randle tried to escape from the cell every time the door was opened; also, other in-

mates complained about his erratic behavior. The jail officials then removed him to an isolation, or lunacy cell, after first taking his belt and shoes. Randle resisted being moved but this resistance was overcome without actual violence on his part.

Albert Lee Matthews, the jail cook, took food and water to Randle in the isolation cell. This cell had been completely empty of any furniture whatsoever until Randle was put in it. The jailer then had a mattress, mattress cover and a blanket brought in. On the morning of September 15, after having been in the jail for three days without any medication, Randle, at approximately 8 or 9 a. m. observed Sheriff L. B. Williams approach the jail, and he called out to the sheriff, inquiring as to who had had him arrested. Williams went inside and determined that the plaintiff had signed the arrest affidavit. Ten or fifteen minutes later the sheriff heard someone holler that there was was a fire upstairs in Randle's cell. The parties have stipulated that Randle set fire to his jail cell mattress and bed clothing, causing 30 to 40% burns to his body, and that this fire was set from a match which Randle stated to his cellmate that he "saved for this purpose." (Stip. 11).

On the same date, September 15, lunacy proceedings had been instituted by the plaintiff in state court. By her petition plaintiff stated on oath that Randle was delusional, violent and aggressive; that he was on psychotropic medication but refused to take it and would not see doctors. The plaintiff also stated that Randle was agitated, feeling that "honkies", or white people, were after him; that he was unable to sleep at night, and had been physically abusive to her. Upon the filing of this petition, Jeffery Levingston, a Cleveland attorney, was appointed by the court to represent Randle's interest. He interviewed the plaintiff on September 17, and was informed that plaintiff was of the opinion that Randle was incapable of taking care of himself, and could injure himself, that he had been previously treated at Whitfield and later sent to the mental health care unit at Cleveland. Plaintiff told Levingston that Randle had bit her on a number of occasions, that he

often refused to take his medicine or get medical attention, that on several occasions he had set fire to items of furniture in the house, that he disliked whites, and that she definitely wanted Randle to go to Whitfield for further mental treatment after he had recovered from his burns for which he was then being treated at the Cleveland hospital. The lunacy hearing was set for September 18 but because of Randle's injuries was continued to a later date.

When the jail personnel opened Randle's cell door they saw Randle, with his back to the door, facing the east wall, bent over, clutching his midsection. Randle was hollering that he was on fire and he immediately ran out when he was called. The cell walls, which had been freshly painted, were scorched, and the mattress was largely destroyed by fire. The mattress, estimated to be about 8 feet long and 3 feet wide, covered most of the cell floor area. The cell had a window with broken glass. One witness observed that the whole cell was ablaze, with more fire than smoke.

When Randle came downstairs it was noted that he wore only pants. Sheriff Williams, observing him, did not realize the extent of the burn injuries until the trusty holding Randle removed his hands, to which Randle's skin adhered. Randle was placed in a police car but was unwilling to go with only white people and insisted his friend, Albert Matthews, the black cook at the jail, accompany him. Matthews asked Randle why he had set his cell on fire and burnt himself. Randle responded by saying, "I am tired", that his wife wouldn't bring his children to the jail to visit him, that she wanted him committed to Whitfield because she wanted his checks, and he had brought the match from the bullpen.

Upon Randle's arrival at the Cleveland Hospital, he was seen by Dr. Lindsey, who found that Randle had received burns to about 30% of his body, that the patient was agitated, irrational and uncooperative. The doctor estimated that Randle had about 20% third degree burns and 10% second degree burns, that these burns were noted

primarily to be on Randle's back and arms, but he could not recall whether burns were on Randle's feet or legs. Dr. Lindsey was of the opinion that Randle was severely psychotic, appeared to be having hallucinations and stated he had a history of being treated for schizophrenia episodes. Dr. Small, of the Mental Health Clinic, was called in for consultation; he, too, made a diagnosis that Randle was schizophrenic. Social workers Patsy Krutz and Betty Fullilove were of like opinion. Dr. Lindsey treated Randle's burns with dressings and intravenous fluids, after giving medication to calm him down. Despite his heavy sedation, Dr. Lindsey stated that Randle was so psychotic that he was not comatose but remained awake most of the time, both day and night. He administered Mellaril and other medication prescribed by the Whitfield physicians to control Randle's behavior. Randle remained in the Cleveland hospital under Dr. Lindsey's care until September 24 when he had developed infection and was in need of skin grafts. On that date he was transferred to the Greenville Burn Unit and placed under the care of Dr. Robert Love. Love, a plastic surgeon, found Randle to be suffering from 40% third degree burns; that the worst burns were on the patient's back and on both arms, both front and rear, and on the left leg, both front and rear. Randle was admitted at 2:30 in the afternoon and died on the night of the day of his admission. Dr. Love executed a death certificate to the effect that the cause of death was accident due to burns. Dr. Love stated that during his examination of Randle he was unable to detect any psychotic condition and was without any knowledge of the events which led up to Randle's incarceration at the jail and the outbreak of the fire.

Continental's policy, in force on the date of the accident, insured Randle against injury during the policy period. Pertinent provisions of the policy are as follows:

"Part I.

'Injury' wherever used in the policy means bodily injury caused by an accident occurring while the policy is in force as to the Insured Person and resulting directly and independently of all other causes, in loss covered by the policy."

"EXCLUSIONS

Part VIII.

The policy does not cover any loss to an Insured Person caused by or resulting from: (1) injury sustained in consequence of riding as a passenger or otherwise in any vehicle or device for aerial navigation, except as provided in Part V; (2) declared or undeclared war or any act thereof; (3) service in the armed forces of any country; or (4) *suicide or any attempt thereat by the Insured Person while sane or self-destruction or any attempt thereafter by the Insured Person while insane.*" (Emphasis added)

II. *Conclusions of Law*

This court has unquestioned jurisdiction because of diversity of citizenship and requisite amount in controversy. Since the policy was issued and delivered to the insured in Mississippi under a group plan applicable to all employees at the plant of Baxter Laboratories at Cleveland, Mississippi, the substantive law of Mississippi controls in determining the rights and obligations of the parties.

Mississippi jurisprudence has certain well settled precedents in the field of an insurer's liability under accidental death policies. Plaintiff contends that the insured's death was caused by accident and that the exclusions asserted by defendant do not apply to defeat coverage since Randle neither attempted suicide while sane nor attempted self-destruction while insane. Defendant contends that the death was not accidental, but even if so, coverage was excluded because of Randle's attempt at suicide while sane, or in any event, his attempted act of self-destruction while insane.

Under Mississippi law, the burden is upon the beneficiary in an accidental death policy to show by a preponderance of the evidence that the insured's death resulted from external and violent means; that when death appears, as here, to have been sustained through external and violent

means, a presumption arises that the injury was sustained through accidental means, and, absent other evidence, is sufficient to make out a prima facie case of liability; that, while there is a presumption against suicide, this is rebuttable in fact; and where the insurer produces evidence which makes the question of suicide a factual issue, the plaintiff, though aided by the dual presumptions of accident and against suicide, must nevertheless carry the ultimate burden of persuasion that death was due to accident and not suicide. *Jefferson Standard Life Ins. Co. v. Jefcoats,* 164 Miss. 659, 143 So. 842 (1932); *New York Life Ins. Co. v. Wood,* 182 Miss. 233, 180 So. 819 (1938); *State ex rel. Richardson v. Edgeworth,* 214 So.2d 579 (Miss.1968); *Taylor v. Insurance Co. of North America,* 263 So.2d 749 (Miss. 1972).

■ It is well settled law that no presumption against suicide arises where it appears that decedent was insane. *Edgeworth,* supra, at 585; Anno. 112 A.L.R 1278 (1938).

■ The courts, including Mississippi, have held that an exclusion because of suicide did not apply where the insured was insane at the time of his death, since being without mental capacity he was incapable of intending to kill himself. 45 C.J.S. Insurance § 844, p. 924; *In Sovereign Camp, W.O.W. v. Hunt,* 98 So. 62, at 63 (Miss. 1923), the state supreme court held that

. . . a stipulation in a policy by which the insurance company was not to be liable if the insured committed suicide relieved the company from intentional self-destruction by the insured, but did not relieve it from liability for unintentional self-destruction; and they held under such a stipulation that, where the insured committed suicide while insane, it was an unintentional self-destruction and the company was liable. This, of course, was on the ground that an insane person was incapable of forming an intention. These decisions of the courts were followed by a suicide clause in the policies of some life insurance companies, providing, as this one does, that the death of the

insured by self-destruction "sane or insane," should avoid the policy. Under that stipulation the courts have generally held that self-destruction avoided the policy, whether the insured was sane or insane. There seems to be no cases to the contrary. The purport of these decisions is that the clause in question simply means that if the insured is guilty of self-destruction the policy is avoided even though he is insane and therefore incapable of forming the intention to destroy himself.

The rationale of this early supreme court case has been followed by the courts in many jurisdictions. See Anno. 9 A.L.R.3d 1015, § 5 at 1032, where the following statement appears

. . . in order for the insurer to avoid liability under an exclusion of coverage of death from suicide, sane or insane, it need not be shown that the insured have had the mental capacity to realize the physical nature or consequences of his act or to form a conscious purpose to kill himself, the view taken being that if the act of self-destruction would be regarded as suicide in the case of a sane person, it would be so treated as to an insane insured, regardless of whether he was capable of realizing that his act would result in his death, or of entertaining an intention to kill himself. (citing *Sovereign Camp,* supra)

■ In the case sub judice, a prima facie case of accidental death was made out by plaintiff's showing that the insured received fatal burns. This prima facie showing, however, was overcome by substantial evidence produced by the defendant that the act of setting the cell on fire, which caused the insured to suffer fatal burns, occurred while he was insane, therefore coverage under the policy was excluded. We must first consider whether Randle intended to take his own life, or to commit suicide, as a sane person. On that point, the record contains conflicting evidence from which different inferences might be drawn. For example, the insured's immediate exit from the burning cell, his concern

about his injuries and his chances of recovery, and his endeavor to obtain insurance information from his employer while still a patient in the Cleveland hospital would be inconsistent with deliberate suicide. Conversely, Randle's statements to his friend, Matthews, that he was tired, that his wife and children had forsaken him, and that his wife was concerned, not with his welfare, but only with having him committed to Whitfield in order to get his checks, and his conduct leading to his death would indicate intentional suicide, if committed by a sane person. As the trier of fact, we hold that had Randle been sane, his acts would have been suicidal. That Randle set fire to his mattress in a small cell, behind locked doors with no means of escape, causing extensive burns to his body, can only be viewed as an act of self-destruction or attempt thereat. Such conduct, necessarily, is life endangering and may reasonably be expected to produce serious bodily injury, if not death, to one starting such a fire.

The overwhelming weight of the evidence—indeed the uncontradicted medical testimony in the case—was that Randle was periodically subject to schizophrenic episodes and without staying on the regular prescribed medication to control his psychotic behavior, he manifested gross disorientation, aggressive as well as irrational, erratic and delusional behavior. It is evident that severe psychosis was existing at the time Randle set his mattress on fire. This is borne out by his statement it was cold and he wanted to see the sheriff, demonstrating that he was incapable of comprehending that a fire in the confines of a small cell would pose danger to him. The long history of mental illness, which included diagnoses and treatment for schizophrenia immediately before and immediately after the fire, established that Randle was suffering from a severe mental disorder. A mental disorder of the severity shown by the proof cannot be classified other than as insanity. On this record we are compelled to conclude that setting the mattress on fire causing burns which resulted in Randle's death was an act of self-destruction or attempt thereat by an insane insured. We

thus absolve the defendant from all liability to the plaintiff.

Let an order issue accordingly.