[Civ. No. 39187. First Dist., Div. One. May 16, 1978.]

GERALD GRANT, as Special Administrator, etc.,
Plaintiff and Appellant, v.
F. P. LATHROP CONSTRUCTION COMPANY,
Defendant and Appellant;
INDUSTRIAL INDEMNITY COMPANY, INC., Intervener and
Respondent.

EVA K. LeFLORE et al., Plaintiffs and Appellants, v.
F. P. LATHROP CONSTRUCTION COMPANY,
Defendant and Appellant;
INDUSTRIAL INDEMNITY COMPANY, INC., Intervener and
Respondent.

**COUNSEL**

Jettie Pierce Selvig, James L. O'Dea and Kent A. Russell for Plaintiffs and Appellants.

Ropers, Majeski, Kohn, Bentley & Wagner and Michael J. Brady for Defendant and Appellant.

No appearance for Intervener and Respondent.

**OPINION**

**ELKINGTON, J.**—The first of the above captioned actions was brought by Jerry LeFlore during his lifetime against F. P. Lathrop Construction Company, a corporation (hereafter for convenience, Lathrop), for damages for personal injuries proximately caused by Lathrop's negligence. Upon LeFlore's death his personal representative was substituted as plaintiff. The second of the two actions was commenced after LeFlore's death, by his wife and children, against Lathrop for damages for wrongful death. It was founded on the same claim of negligence as was the earlier action. The two actions were consolidated for trial.

Following the trial, by jury, Lathrop's motion for judgment notwithstanding the verdict was denied by the superior court. The jury concluded by their verdicts that LeFlore's personal injuries and death had been proximately caused, in part, by Lathrop's negligence. In the personal injury action they fixed the damages at $43,191.83. In the wrongful death action damages were assessed at $554,272. The jury assigned the liability of Lathrop therefor at 75 percent, and that of the subcontractor employer of LeFlore at 25 percent. LeFlore himself, the jury found, had made no contribution of negligence toward his injuries and death. The superior court thereafter granted Lathrop's motion for a new trial on the grounds of "errors in law in the instructions given by the court to the jury (CCP section 657(7))."

The plaintiffs of the actions have appealed from the order granting a new trial. Lathrop has cross-appealed from the judgments entered upon the jury's verdicts, and from the "denial of Lathrop's motion for judgment notwithstanding the verdict."

Uncontroverted evidence at the trial established the following factual context.

LeFlore, a journeyman roofer, was employed by a subcontractor upon the roof of a building under construction by Lathrop, a general contractor. Near the edge of the roof he slipped on a "plastic, goopy material" he had been applying, which was described as "very, very slippery." There were no "protective railings," or lifelines or other safety devices, around the roof's edge and LeFlore fell some 30-35 feet to the ground. As a result he became a "permanent paraplegic," for whom "[n]o rehabilitation beyond a wheelchair existence" could be expected. About 17 months later he committed suicide by ingesting a lethal amount of barbiturates.

We proceed now to our consideration of the issues of the parties' appeals.

*Plaintiffs' appeal from the order granting a new trial.*

The superior court granted Lathrop's motion for a new trial upon the stated grounds that it had erred (1) in its "instruction on causation in relation to suicide," and (2) in giving "BAJI Instruction 3.45" relating to violations of safety orders.

Code of Civil Procedure section 657, as amended in 1965, requires that in granting a new trial "the court shall specify the ground or grounds upon which it is granted and *the court's reason or reasons for granting the new trial* upon each ground stated." (Italics added.) The state's high court has repeatedly said that these, and other, provisions of section 657 must be followed in order that there may be a *"meaningful" appellate review* of an order granting a new trial. (*Mercer* v. *Perez* (1968) 68 Cal.2d 104, 113 [65 Cal.Rptr. 315, 436 P.2d 315]; *Scala* v. *Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359, 363 [90 Cal.Rptr. 592, 475 P.2d 864]; *La Manna* v. *Stewart* (1975) 13 Cal.3d 413, 419 [118 Cal.Rptr. 761, 530 P.2d 1073].)

It thus becomes our function to inquire whether there is substantial basis in the record for the superior court's two stated reasons for granting Lathrop's motion for a new trial.

We first consider whether the court erred in its "instruction on causation in relation to suicide." The questioned instruction was in this language: "Where the negligent wrong of a defendant only causes a mental condition in which the injured person is able to realize the nature of the act of suicide and has the power to control it if he so desires, that act then becomes an independent intervening force and the defendant

cannot be held liable for the death. On the other hand, if the negligent wrong causes a *mental condition* which results in an uncontrollable impulse to commit suicide, then the defendant may be held liable for the death." (The italics added.)

The reason ascribed by the court that the instruction was erroneous follows: "This instruction was a modification made by the Court on the instruction as submitted by Defendant's counsel after objection to the instruction by counsel for the Plaintiff. The modification was the substitution of the words *'mental condition'* for the words *'mental illness,'* which as hereinafter pointed out, in effect eliminated the most important factor in the entire instruction, to wit: the necessity of a condition amounting to *insanity,* and resulted in the instruction becoming an erroneous statement of law." (Italics added.)

"Mental illness" and "insanity" are generally considered synonymous terms, and here the superior court properly so considered them. *"Mental disease, Mental disorder, and Mental illness* . . . are to be construed to include insanity, . . ." (44 C.J.S., Insane Persons, § 2, pp. 38-39, and see authority there collected.) And " ' "insanity" is a broad, comprehensive, and generic term, of ambiguous import, for all unsound and deranged conditions of the mind' . . . ." (*Dribin v. Superior Court* (1951) 37 Cal.2d 345, 352 [231 P.2d 809, 24 A.L.R.2d 864].) We shall also treat the terms "mental illness" and "insanity" as synonymous, and for convenience use the word "insanity."

■ The instant issue is thus condensed to the question—whether a distinction may reasonably and legally be made between "insanity" which proximately results in an uncontrollable impulse to commit suicide and a *"mental condition"* proximately resulting in the same uncontrollable impulse—in the determination whether Lathrop's tortious conduct rendered it liable to LeFlore's heirs for his death.

■ As pointed out, the state's high court, defining "insanity," held that it is " 'a broad, comprehensive, and generic term, of ambiguous import, for all unsound and deranged *conditions of the mind'* . . . ." (*Dribin v. Superior Court, supra,* 37 Cal.2d 345, 352; italics added.) Surely a "mental condition which results in an uncontrollable impulse to commit suicide" is an "unsound and deranged condition of the mind."

And generally it is held that "insanity" is "a sort of generic term, comprehending all kinds and *conditions of mental unsoundness and*

*derangement*, . . ." (*Ex Parte McKenzie* (1930) 116 Tex.App. 144 [28 S.W.2d 133, 134], italics added; see also *State* v. *Bruntlett* (1949) 240 Iowa 338 [36 N.W.2d 450, 458]; *Burnham, Adm'r* v. *Mitchell* (1874) 34 Wis. 117, 136; 44 C.J.S. Insane Persons, § 2, p. 9, and authority there collected.) The term is also held to embrace "such a disordered or distorted *condition* of the mind as renders the individual incapable of reasoning *or of exercising the will*; . . ." (44 C.J.S., Insane Persons, § 2, p. 11; italics added.)

Much emphasis was placed by the superior court upon our opinion in *Tate* v. *Canonica* (1960) 180 Cal.App.2d 898 [5 Cal.Rptr. 28], where the complaint alleged "wrongful acts done both intentionally and negligently, which caused a *mental condition* which resulted in the suicide." (P. 919, italics added.) Because the distinction between "mental illness or insanity," and "mental condition," was not at issue, we used those expressions interchangeably, and apparently to the understandable confusion of the trial court of the case now before us. But a close reading of the case will indicate (p. 918) that we held the complaint failed to state a cause of action for lack of an allegation that "the decedent's mental disturbance was such that in committing suicide he was acting under an uncontrollable impulse." We then concluded that allegations of a negligent wrong which proximately caused a "*mental condition*" resulting in an uncontrollable impulse to commit suicide, stated a cause of action. The substantially similar language of the here questioned instruction is found to be precisely in accord with our holding in *Tate* v. *Canonica*.

Soon after *Tate* v. *Canonica* we addressed the general subject in *Burnight* v. *Industrial Acc. Com.* (1960) 181 Cal.App.2d 816 [5 Cal.Rptr. 786], where once again the here debated distinction was no part of the issue. But we nevertheless held (p. 821) that "suicide cannot be *intentionally* self-inflicted if, in spite of his act being one of conscious volition, the suicide, because of *mental condition* [our present emphasis] resulting from the injury, is unable to control the impulse to kill himself." This holding also comports with the instruction now under consideration.

Other authority so interprets the rule.

*Lucas* v. *City of Long Beach* (1976) 60 Cal.App.3d 341 [131 Cal.Rptr. 470]. Holding a jailer not to be responsible for the suicide of a prisoner, the court explained (p. 349): "No act or omission of [the jailer] produced the *mental condition* which prompted [the prisoner] to do what he did." (Italics added.)

*Orcutt* v. *Spokane County* (1961) 58 Wn.2d 846 [364 P.2d 1102, 1105], held a tortfeasor liable where "the injury sustained by the decedent caused a *mental condition* which resulted in an uncontrollable impulse to commit suicide, in the sense that the decedent could not have decided against and refrained from killing himself, and because of such uncontrollable impulse, the decedent committed suicide." (Italics added.)

*Arsnow* v. *Red Top Cab Co.* (1930) 159 Wash. 137 [292 P. 436, 442-443]. "[L]iability may exist on the part of a person . . . when the act causing the death [by suicide] is the result of an uncontrollable impulse resulting from a *mental condition* caused by the injuries." (Italics added.)

*Bogust* v. *Iverson* (1960) 10 Wis.2d 129 [102 N.W.2d 228, 232]. "[T]he wrongful act is considered as within and part of the line of causation . . . *where the wrongful act produces* a rage or frenzy or *uncontrollable impulse,* during which state self-destruction takes place." (Italics added.)

*Daniels* v. *New York, N.H. & H.R. Co.* (1903) 183 Mass. 393 [67 N.E. 424, 426]. "[W]e are of opinion that the liability of a defendant for a death by suicide exists . . . when the death is the result of an uncontrollable impulse, . . ."

*State* ex rel. *Richardson* v. *Edgeworth* (Miss. 1968) 214 So.2d 579, 587. "We hold that where the suicide is committed in response to an uncontrollable impulse, recovery may be had if the *mental state* of deceased was substantially caused by the defendants' intentional wrongful acts, . . ." (Italics added.) (Note: No contention is made that in California the defendant's wrongful act must be "intentional.")

And no authority has come to our attention holding that one's death following a wrongful act causing a *mental condition proximately resulting in an uncontrollable impulse* to commit suicide, is not actionable.

The case of *Majors* v. *County of Merced* (1962) 207 Cal.App.2d 427 [24 Cal.Rptr. 610] is found to be of no aid to Lathrop. There the court iterated (p. 439) the statement of *Tate* v. *Canonica, supra,* 180 Cal.App.2d 898, 915, that "if the negligent wrong causes mental illness which results in an uncontrollable impulse to commit suicide, then the wrongdoer may be held liable for the death." The court refrained from making the here argued for distinction between insanity, and mental condition, resulting in an uncontrollable impulse to commit suicide. Nor did the court construe *Tate* v. *Canonica* as requiring a condition of "insanity"; instead

it interpreted (p. 438) the required condition as "induced mental and emotional instability . . . ."

Lathrop argues that: "*Everyone* presumably has a 'mental condition' at all times in life—but certainly everyone is not mentally ill or insane." The observation is undoubtedly true, but here we are not dealing with a "mental condition" in the abstract; instead we are concerned with a "mental condition which results in an uncontrollable impulse to commit suicide, . . ." Such a mental condition, as pointed out, will reasonably be equated with "mental illness" or "insanity."

No fair distinction may be made between a mental condition, and mental illness or insanity, proximately caused by another's tortious conduct which results in an uncontrollable impulse to commit suicide. In each such case, it is the uncontrollable impulse for which the tortfeasor should be held responsible. No basis in reason appears why he should be excused from liability in the one situation, but not in the other. We accordingly hold that the superior court's "instruction on causation in relation to suicide" was a correct statement of the law.

We advert now to the remaining instructional error assigned by the superior court as a reason for the grant of a new trial.

Labor Code section 6304 formerly provided: " 'Employer' shall . . . include every person having direction, management, control, or custody of any . . . place of employment, . . ." Such an employer is sometimes called a "statutory employer," and was so described by the court and the parties at the trial in the superior court.*

The jury were instructed in relation to the duties imposed by law upon a statutory employer, such as: to furnish a "safe" place of employment for the employees (Lab. Code, § 6400); to furnish "safety devices and safeguards" (Lab. Code, § 6401); not to permit an employee to be in a "place of employment which is not safe" (Lab. Code, § 6402); to "adopt and use methods and processes" as are "reasonably adequate to render the . . . place of employment safe" (Lab. Code, § 6403); and to comply with safety orders of the California Division of Industrial Safety. Among such safety orders instructed upon by the court were the following:

---

*Labor Code section 6304 was amended, effective April 1, 1972, which was after the accident and suicide of this case.

"Roof Hazards. (a) During roofing operations acceptable provisions shall be made for protection of workmen from falling off roofs, especially sloped roofs.

"Acceptable provisions under the Safety Construction Orders as therein provided may be the following:

"(1) Railings and toeboards for elevations 7½ feet or more above the ground floor or level underneath.

"(2) Safety belts and lifelines for employees whose work exposes them to falling in excess of 15 feet from the perimeter of a structure.

"(3) Safety nets when the elevation is 25 feet or more above the ground and when the use of safety belts or lifelines or more conventional types of protection are clearly impracticable."

Lathrop makes no complaint about such instructions as were given in respect of these and other duties of a statutory employer. Nor is it contended that the jury were improperly instructed on former Labor Code section 6304's definition (quoted *ante*) of the statutory employer.

The instruction here at issue is commonly known as BAJI No. 3.45 (1st par.). It follows: ■ "If you find that *a party to this action* violated the provisions of the safety code or the safety order that I just read to you and that such violation was a proximate cause of injury or damage to another, you will find that such violation was negligence unless such party proves by a preponderance of the evidence that he did what might reasonably be expected of a person of ordinary prudence acting under similar circumstances who desired to comply with the law." (Italics added.)

The trial court's reason for basing the new trial, in part, on this instruction is stated in this manner: "[T]he Court advised the jury that Defendant, Lathrop Construction Company, owed a duty to the decedent, the violation of which would be negligence. However, the fact is that such duty was owed by Defendant, Lathrop Construction Company, to decedent *only* if Defendant, Lathrop Construction Company, was the statutory employer of decedent, which was a matter of fact for the jury to determine."

Elsewhere the court did, in clear language, instruct the jury (1) that defendant Lathrop owed a duty to the decedent the violation of which would be negligence *only* if it "was the statutory employer of decedent"; and (2) that Lathrop was such a statutory employer *only* if it had control of the premises where LeFlore had fallen. We set forth those instructions; the italics are ours.

"Now there are two actions, as I have advised, and one is the survival [*sic*] action and one is the wrongful death action. In the survival action brought by the Special Administrator of the Estate of Jerry LeFlore, the *plaintiff has the burden of establishing* by a preponderance of the evidence all of the facts necessary to prove the following issues: 1. *That the defendant F.P. Lathrop Construction Company was plaintiff's statutory employer, or the decedent's statutory employer*; . . ."

"In the wrongful death action brought by the heirs of plaintiff's decedent, *plaintiffs have the burden of establishing* by a preponderance of the evidence all of the facts necessary to prove the following issues: *That the defendant F.P. Lathrop Company was the statutory employer of plaintiff's decedent*; . . ."

"Now, a general contractor owes to the employees of a subcontractor a duty to exercise reasonable care to keep the premises *over which the general contractor has control* in a reasonably safe condition and to provide a safe place for such employees to work. It is also the duty of a general contractor to warn such employees of any danger which is not obvious and which is known to the general contractor or discoverable by him in the exercise of ordinary care.

"A *general contractor in control of premises* where work is being done by employees of a subcontractor is an employer subject to the duty imposed by the Labor Code to provide a safe place of employment and to comply with the applicable safety provisions thereof.

"*Where the general contractor retains only the right of general supervision over the premises* to bring about a satisfactory completion of a subcontract, *he is not an employer subject to the duties imposed by the Labor Code*."

These several instructions reiterated (1) that plaintiffs had the burden of establishing by a preponderance of the evidence that Lathrop was LeFlore's *statutory employer*, (2) that Lathrop's responsibility as a

statutory employer was in respect only to premises over which it had *control,* as provided by former Labor Code section 6304, and (3) that unless Lathrop had such *control* over the subject premises it was "not an employer subject to the duties imposed by the Labor Code." We are of the opinion that it was highly improbable that the jury were misled to the contrary by the questioned instruction.

We have considered the several authorities relied upon by Lathrop in support of the superior court's reasons for granting the new trial. None, in our opinion, impugns in any way the above conclusions reached by us.

For these several reasons we find "no substantial basis in the record" (see Code Civ. Proc., § 657) for the reasons given by the superior court for granting Lathrop's motion for a new trial.

*Defendant Lathrop's appeal from the judgments, and from the judgment and order denying judgment notwithstanding the verdict.*

Lathrop's first contention is stated in this manner: "In connection with Lathrop's appeal from the judgment entered on the jury verdict and in connection with Lathrop's appeal from the lower court's order denying our motion for judgment notwithstanding the verdict, it is Lathrop's position that, as a matter of law, the decedent was *not* insane or mentally ill when he committed suicide and that, therefore, judgment should have been entered in favor of Lathrop insofar as the wrongful death case was concerned."

Insofar as the contention may be based upon the theory that the jury found LeFlore to have suffered a "mental" condition, and not "mental illness" or "insanity," resulting in an uncontrollable impulse to commit suicide, for the reasons heretofore expressed it is found to be invalid.

■ But a related argument of Lathrop is that "[t]he decedent's suicide was a voluntary act and was, therefore, a legal intervening cause, insulating defendant Lathrop from liability for said suicide and for said death."

A psychiatrist testified that LeFlore had made a "conscious choice as opposed to accidental means to take his life." The testimony may reasonably have meant, and presumably was so considered by the jury, that LeFlore "knowingly," as distinguished from "accidentally," took his own life.

Asked, "What is the basis of that opinion?" the same witness testified: "A. The basis of that is that I don't know of any prior psychiatric problems in this man, prior to his accident. From what I know about people who have been disabled by virtue of paraplegia or quadriplegia, this imposes a tremendous change in their way of living and their way of existing. Becoming a paraplegic is like having a part of you die. If you are a man, you are not going to be able to have sexual relationships with anyone. You cannot get around as easily as you used to. If you like to hunt or fish, those activities are pretty much excluded. For most people who are affected by chronic illness such as this, the wish to be independent is so severely frustrated that one becomes depressed periodically, regularly, and sometimes continuously. And one of the most common symptoms of depression is the inability to sleep. This inability to sleep was present in this man by virtue of these various drugs, by use of chloral hydrate, which is in the records, over a significant period of time, and which I assume led him to use Seconal, which in turn, I think, led to his death."

This testimony and other evidence of LeFlore's mental condition throughout the months following his injury, presumably believed by the jury, constituted substantial evidence that Lathrop's negligence proximately resulted in an uncontrollable impulse to commit suicide.

The remaining contention of Lathrop's appeal is stated in its briefs as: "It is our position that if for some reason the court does not affirm the order granting new trial, and if the court is not inclined to grant judgment notwithstanding the verdict, the court should, nevertheless, send the matter back for a new trial based upon the evidence of juror misconduct."

The same argument was strenuously urged by Lathrop in the superior court in support of its motion for a new trial. The court declined to find such error in its determination of the motion.

The claimed jury misconduct appeared from affidavits which, as stated by Lathrop's attorney, recited the following. One of the jurors "admits the suicide in her family, she admits discussing it in the jury room, but she doesn't think it was bad or influential or harmful or prejudicial." Other jurors had made remarks about "a native American versus a big corporation," and "Indian" (LeFlore was partly American Indian), and "poor fellow," and "union," and "poor union members," and "members of a union versus corporations," all of which was

"inflammatory concerning minorities and poor people in unions, . . ." Yet another juror said that "not all the questions were fully considered because of the strong insistence of the black jurors, who were emphatic and strong in their viewpoints." And another juror had sought the definition of "proximate" from a dictionary.

It appears that none of the jurors had concealed any factual matter on the jury's voir dire examination. And other affidavits of jurors attested to the "fairness" in which the jury deliberations were conducted.

As noted, the trial court found against Lathrop on the instant issue in ruling upon the motion for a new trial.

■ Except, as indicated, where there is no substantial record support for the "reasons" required by Code of Civil Procedure section 657, the "granting or denying of a motion for a new trial is within the discretion of the trial court and in the absence of a showing of [an abuse of discretion] will not be interfered with by the appellate court." (*Kolar* v. *County of Los Angeles* (1976) 54 Cal.App.3d 873, 880 [127 Cal.Rptr. 15].) And the "determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." (*Jiminez* v. *Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92].)

■ In determining a dispute whether there was jury misconduct and, if so, whether substantial prejudice occurred, it has been held that reviewing courts are bound by the trial court's "determination of that question of fact as fully as we would be upon any other issue of fact." (*Loeb* v. *Kimmerle* (1932) 215 Cal. 143, 156 [9 P.2d 199]; and see *Lindemann* v. *San Joaquin Cotton Oil Co.* (1936) 5 Cal.2d 480, 495-496 [55 P.2d 870]; *Noble* v. *Key System, Ltd.* (1935) 10 Cal.App.2d 132, 143 [51 P.2d 887].) " 'The question whether, under all the circumstances, an irregularity has materially affected substantial rights and prevented a fair trial is addressed to the discretion of the trial court, which—having heard and seen the witnesses, and having knowledge of circumstances which may not be reproduced in the record—is in better position than the appellate court to determine the effect.' " (*Head* v. *Logan* (1940) 39 Cal.App.2d 243, 246 [102 P.2d 813].)

■ Applying these rules, no abuse of the superior court's discretion is observed in its rejection of Lathrop's instant complaint.

A related claim of error stems from the superior court clerk's inadvertence in delivering a copy of a witness' deposition to the deliberating jury. Lathrop has made no showing of prejudice therefrom in the superior court or in this court. And here also, the contention was rejected by the superior court on Lathrop's motion for a new trial. ■ "[A]lthough the taking of a deposition into the jury room is erroneous, the question of whether it constitutes ground for a new trial or a reversal is one addressed to the sound discretion of the court." (*Davenport* v. *Waite* (1959) 175 Cal.App.2d 623, 628 [346 P.2d 501].) Again we observe no abuse of discretion.

We have considered also the many incidental points and arguments raised by Lathrop on its appeal. None appears to have merit; nor does prejudice appear.

The order granting a new trial is reversed. The order (or judgment) denying defendant's motion for judgment notwithstanding the verdict is affirmed. The judgment, or judgments, entered upon the jury's verdict are reinstated, and affirmed. Plaintiffs will recover their costs of appeal.

Racanelli, P. J., and Sater, J.,* concurred.

A petition for a rehearing was denied June 12, 1978, and the petition of the defendant and appellant for a hearing by the Supreme Court was denied July 13, 1978. Richardson, J., was of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.