28 Cal.Rptr.3d 605 (2005)
129 Cal.App.4th 635
ALLISON C., Plaintiff and Appellant,
v.
ADVANCED EDUCATION SERVICES, Defendant and Appellant.
No. E034358.
Court of Appeal, Fourth District, Division Two.
May 18, 2005.
Review Denied August 10, 2005.[*]
*608 Richard E. Hodge, Inc., Richard E. Hodge, Santa Monica, Robert W. Woods, James M. Baynes, William E. Johnson; Law Offices of J.S. Hermanson and J.S. Hermanson, San Bernardino, for Plaintiff and Appellant.
Reid & Hellyer, David G. Moore, Michael G. Kerbs, Riverside; Manning & Marder, Kass, Ellrod, Ramirez, Jeffrey M. Lenkov and Steven J. Renick, Los Angeles, for Defendant and Appellant.

OPINION
RAMIREZ, P.J.
This case involves a complaint by a mother for the wrongful death, by suicide, of her severely emotionally disturbed 13-year-old son. Plaintiff Allison C.[1] appeals from an amended judgment entered in her favor and against defendant Advanced Education Services (AES) after a jury trial. She claims that the trial court erred in apportioning fault and therefore improperly calculated the amount of damages. She also appeals from the trial court's order granting AES's motion for a new trial. She asserts that neither ground cited by the trial courtprejudicial juror misconduct or excessive damageswas supported by the evidence, and further, that even if they were, the trial court erred in failing to order a limited retrial as to damages only. AES also appeals from the amended judgment and, in addition, from the order denying its motion for judgment notwithstanding the verdict. It claims that there was no substantial evidence to support the verdict that it was liable for Dylan's death or Allison's emotional distress. While AES's notice of appeal also purported to appeal from the trial court's ruling on its motion to tax costs, that point of alleged error was abandoned by the failure to *609 raise it in the briefs. (Marocco v. Ford Motor Co. (1970) 7 Cal.App.3d 84, 87, fn. 1, 86 Cal.Rptr. 526.) We reverse the order denying AES's motion for judgment notwithstanding the verdict and consequently need not reach the merits of the order granting AES's motion for a new trial, nor need we consider the parties' appeals from the amended judgment.

FACTS AND PROCEDURAL HISTORY
Dylan was born in 1987 to Allison, and was her only child. Dylan began to have emotional problems in the third grade when he moved from Bakersfield to Crestline, California, after the breakup of Allison's marriage to his stepfather. As early as 1996 Dylan was hospitalized for a week at a local behavioral medicine center due to his out-of-control behavior. After a brief time out of state, Allison and Dylan moved to Redlands, California. Dylan attended school in Redlands for less than two months before being raped at knifepoint by a 14-year-old boy and subsequently moving to Bakersfield to live with his ex-stepfather for six months. Allison visited him at least monthly and spoke to him on the phone nightly. Upon his return, Dylan was enrolled in school in Loma Linda, near Allison's employment.
Very shortly thereafter, it was determined that Dylan required special education services for his emotional/behavioral condition, including his prior attempts at suicide and his reaction to the fact that he had been raped. At some time in 1998, Dylan was diagnosed as bipolar (manic depressive) by his psychiatrist, a condition that was aggravated by post traumatic stress disorder, from which he also suffered after the 1997 rape.
Dylan's first placement at a nonpublic school was from June 1, 1998, to January 15, 1999. Because Dylan's behaviors were out of control, he required a more supervised environment, and he was moved to a residential nonpublic school, where he attended from February 22, 1999, to August 17, 2000. While he was there Allison visited him twice per month and spoke to him nightly. Dylan made progress at the residential nonpublic school and Allison wanted him to come back home, so his individualized education program team decided that he would be released from that facility, despite some continued self-destructive and inappropriate behaviors.
Pursuant to a contract between AES and the East Valley Special Education Local Planning Agency, Dylan was placed at a nonpublic school owned by AES for 174 days of instruction plus round-trip transportation between home and school each day. Dylan actually began attending that school in September 2000.
AES is a corporation created to educate special needs children on different campuses throughout California. The students at the facility Dylan attended were primarily those with emotional/behavioral and learning disabilities. Dylan's school employed two teachers, plus two classroom aides and a program manager as well as a therapist, and an office manager.
Prior to accepting Dylan as a student, the AES school was provided with documentation regarding his history and therefore was aware of his diagnoses and behavioral issues, including his prior suicide attempts and his tendency to be absent without leave (AWOL) from school campuses, and was aware that he was being transferred from a residential facility. Upon his enrollment, Dylan was provided with a school policy statement indicating that he had a right to be safe. Dylan was also provided with a list of school rules indicating that he would be supervised by a staff member at all times. These documents were signed by both Dylan and Allison.
*610 After leaving the residential facility and while at the AES school, Dylan's behavior started to decline. Several incident reports were made regarding Dylan's behavior while at the AES school, including fights with other students, putting a tack through his ear, intentionally cutting his thumb, carrying a pack of cigarettes and a lighter on the bus, taking apart a fence, and giving a fellow student poison to drink. However, during his time at the AES school, Dylan did not express any suicidal thoughts.
Shortly after beginning classes at the AES school, Dylan went AWOL twice on the same day. The first time he left campus and panhandled, then went to a feed store and bought a baby chicken before returning to school. The second time, he refused to leave the chick behind so that he could be transported home (no live animals were allowed on the bus) and therefore walked off on his own after school. Allison was informed of these AWOL incidents. Four days later there was a meeting among school staff, Dylan and Allison regarding his behavior and to discuss strategies to keep him from leaving campus. At this meeting the staff explained the AES school policy regarding AWOL students to Allison, though she could not remember whether, and later denied that, this occurred. Staff would shadow the student on campus to attempt to persuade the student to remain and to determine the student's direction of travel. Physical restraint was not permitted unless the student posed an immediate threat of danger to himself or others, thus, a student normally could not be forcibly kept on campus. The parent would be notified of the AWOL and given the option of allowing the school to contact the authorities, or if the parent could not be reached in a timely fashion, the police would be notified of the AWOL. There was conflicting testimony whether AWOL students would be followed off campus. In certain situations where a student or parent makes a request, or if a student is highly agitated, the school may retrieve the student from the community.
One morning, after this meeting, Dylan used a needle and thread to sew his fingers together through the skin at their tips and reported to staff that he had not taken his medication before coming to school. The thread was removed and he calmly turned the needle over to his teacher. Allison was not contacted about this incident or Dylan's claim not to have taken his medication. Approximately one hour later Dylan left the campus with another student, despite staff attempts to persuade him to return to class. Dylan did not appear agitated and no attempt was made to physically restrain him. Allison was called eight minutes after Dylan went AWOL. Two hours later, and after several phone calls to the school, she reported him missing to the police.
Dylan was missing for three days during which time he was sexually assaulted by an adult male who subsequently pled guilty to the assault. He never returned to the AES school as a student. Dylan returned to the first nonpublic school that he had attended in December 2000. His acting-out behaviors continued there. Some three months later, Allison dropped Dylan off with his grandparents who were to watch him while she went to work. After dinner Dylan went into his grandparents' bedroom, took a rifle from under the bed and shot himself.
On July 16, 2001, Allison filed her complaint against AES, in which she pled a cause of action for general negligence resulting in Dylan's death and injury to herself in the form of emotional distress. She claimed that AES negligently allowed Dylan to leave campus, resulting in his being *611 sexually assaulted, which caused him to take his own life. On April 28, 2003, the case went to trial on theories of wrongful death and negligent infliction of emotional distress. As to the wrongful death, the jury returned a verdict finding that AES's breach of a duty of care to Dylan was a substantial factor in bringing about Dylan's death. It found that both Allison and Dylan were negligent, but their negligence was not a substantial factor in bringing about Dylan's death. It fixed the amount of damages at $5,000,000 and apportioned fault, 60 percent to AES, 8 percent to Allison, 2 percent to Dylan, and 30 percent to others. As to the emotional distress, the jury returned a verdict finding that AES's breach of a duty of care to Allison was a substantial factor in bringing about her injury. It found that Allison was not negligent, but Dylan was, though his negligence was not a substantial factor in bringing about Allison's injury. It fixed the amount of damages at $1,000,000 and apportioned fault, 60 percent to AES, 2 percent to Dylan, and 38 percent to others. Judgment was entered in favor of Allison and against AES in the amount of $3,600,000, plus costs.
AES then filed its notice of intention to move for a new trial on the grounds of jury misconduct, excessive damages, and the insufficiency of the evidence to justify the verdict, which was against law, among others. It also filed a motion for judgment notwithstanding the verdict on the grounds that a finding of fault against Dylan precluded a finding of liability against AES, that the evidence was insufficient to support a finding either that AES breached any duty owed to Dylan or that AES's actions caused Dylan to commit suicide, and that AES owed no duty to Allison as a matter of law. Thereafter, an amended judgment was filed adding an award of costs to Allison in the amount of $20,679.86. Then, after a hearing, the trial court denied the motion for judgment notwithstanding the verdict, but granted the motion for a new trial on the grounds of juror misconduct and excessive damages. These appeals followed.

DISCUSSION

A. Motion For Judgment Notwithstanding the Verdict

We will first address AES's cross-appeal of the trial court's denial of its motion for judgment notwithstanding the verdict. In determining whether to grant a motion for judgment notwithstanding the verdict, a trial court must (1) accept the evidence supporting the verdict as true; (2) disregard all conflicting evidence; and (3) indulge in every legitimate inference that may be drawn in support of the judgment. The court may grant the motion only if there is no substantial evidence to support the verdict and the evidence compels a judgment for the moving party as a matter of law. On appeal from the denial of such a motion, we determine de novo whether there is any substantial evidence, contradicted or uncontradicted, supporting the verdict and whether the moving party is entitled to judgment as a matter of law. (Sweatman v. Department of Veterans Affairs (2001) 25 Cal.4th 62, 68, 104 Cal.Rptr.2d 602, 18 P.3d 29; Paykar Construction, Inc. v. Spilat Construction Corp. (2001) 92 Cal.App.4th 488, 493-494, 111 Cal.Rptr.2d 863; Tognazzini v. San Luis Coastal Unified School Dist. (2001) 86 Cal.App.4th 1053, 1058, 103 Cal. Rptr.2d 790.)
AES raised four grounds in support of its motion: (1) the jury's finding that Dylan was at fault for his own death precluded a finding of liability against AES; (2) AES did not breach any duty that it owed to Dylan; (3) there was no evidence that any alleged negligence on the part of AES *612 caused Dylan's death; and (4) Allison failed to demonstrate that AES was liable to her for negligent infliction of emotional distress due to the absence of a duty to her and the lack of evidence of damages.[2] We will consider them in seriatim fashion.

1. Dylan's Fault for His Own Death

AES first claims that the jury's finding that Dylan was 2 percent at fault for his own death precludes a finding that it was liable according to the holding in Tate v. Canonica (1960) 180 Cal.App.2d 898, 5 Cal.Rptr. 28. That court concluded that "where the negligent wrong only causes a mental condition in which the injured person is able to realize the nature of the act of suicide and has the power to control it if he so desires, the act then becomes an independent intervening force and the wrongdoer cannot be held liable for the death. On the other hand, if the negligent wrong causes mental illness which results in an uncontrollable impulse to commit suicide, then the wrongdoer may be held liable for the death.... If defendant is to avoid liability, the decedent's act must be voluntary, ... in the sense that he could, in spite of his mental illness, have decided against suicide and refrained from killing himself." (Id. at p. 915, 5 Cal.Rptr. 28; see also Grant v. F.P. Lathrop Constr. Co. (1978) 81 Cal.App.3d 790, 795-799, 146 Cal.Rptr. 45.) In other words, for a negligent actor to be responsible for the suicide of another, the suicide must have resulted from an involuntary act resulting from a mental state caused by the negligence.
AES argues that the jury's finding that Dylan was 2 percent at fault for his own death necessarily implies a finding that he was not under an uncontrollable impulse, but had control over the act of suicide. We disagree. The jury's finding could have resulted from a determination that Dylan was at fault during any part of the causal chain, for example, his choice to leave campus, or his choice to accompany his acquaintance to the home of the man who assaulted him. It is therefore possible that Dylan could have been found in some fashion responsible for his own death without necessarily concluding that he did not suffer from an uncontrollable impulse to take his life at the time of the suicide. AES was not entitled to a judgment notwithstanding the verdict on this ground.
AES further argues that demonstrating that Dylan was suffering from an uncontrollable impulse to commit suicide, such that he could not have chosen against the act, was Allison's burden as an element of her cause of action for wrongful death (the jury was so instructed) and that she failed to produce any evidence that would support such a finding by the jury. On the contrary, Allison's expert, Dr. Michael Weiss, testified that at the time Dylan committed suicide he did not have the ability to control the impulse to kill himself. He also testified that this impulse resulted from his reaction to the rape of November 2000. Even were we to accept AES's assertion with respect to Allison's burden of proof as true, a question we do *613 not decide, if credited by the jury, this evidence would have been sufficient to carry Allison's burden of proof on this issue.

2. AES's Breach of A Duty Owed to Dylan

Next, AES asserts that it did not breach any duty that Allison alleged it had to Dylan because it could not use physical force to restrain him to prevent him from leaving campus. In her complaint, she alleges that AES had a duty to maintain custody and control of Dylan, which included not allowing him to leave campus without permission, and also required prompt notification to the authorities when he had done so. Education Code section 56520 prohibits the use of corporal punishment, or procedures that cause pain or trauma, as methods to eliminate maladaptive behaviors in special needs children. Education Code section 49001 exempts from the definition of corporal punishment instances where a reasonable amount of force is necessary to prevent physical injury to persons or damage to property, for self-defense, or to divest a pupil of dangerous objects. Further, California Code of Regulations, title 5, section 3052 provides that an emergency intervention (one that has not been established in a behavioral intervention plan for a particular pupil) "may only be used to control unpredictable, spontaneous behavior which poses clear and present danger of serious physical harm to the individual or others and which cannot be immediately prevented by a response less restrictive than the temporary application of a technique used to contain the behavior." (Id., subd. (i).) Consequently, AES claims, it could not have used any physical force to prevent Dylan from leaving campus unless he posed a clear and present danger of serious physical harm to himself or others.
AES asserts that the evidence did not support a conclusion that Dylan posed such a danger at the time that he left the campus. Therefore, it concludes, it did not breach any duty in failing to physically restrain him from leaving campus and was not responsible for failing to follow him after he left the campus (AES cites no authority for this latter proposition). This argument presupposes that the only method by which AES could have kept Dylan from leaving campus was through physical restraint. However, the evidence in the record supports a conclusion that the AES school staff merely called to Dylan to return to class, and did not actually follow him to the edge of campus or otherwise try to convince him to stay. The evidence also supports a conclusion that based upon his behaviors in the morning, Dylan should have immediately been referred to his therapist for a crisis intervention. Based on the foregoing, the jury could have concluded that had the AES school staff properly discharged its duty and done more, Dylan would have remained on campus without physical restraint, making the point irrelevant. AES's argument also presupposes that the only method by which it could have discharged its duty to Dylan would have been to prevent him from leaving campus. However, the testimony suggested that Dylan could have been shadowed by a staff member once he left campus, or that the police should have been called since Dylan's companion was a resident of a group home. AES has not cited to any evidence or law indicating that its duty to Dylan did not extend to taking these measures to ensure his safety. Indeed, the testimony was that such actions were either the school policy or had been taken by staff in the past.
Finally, the evidence is such that the jury could have inferred that Dylan's behaviors during the morning he went *614 AWOL, including telling his teacher that he had not taken his medication and sewing his fingers together, indicated that he was a danger to himself and therefore that physical restraint would have been justified.
AES argues that these incidents did not support a finding that Dylan was a clear and present danger to himself at the time he was leaving campus. We disagree. Especially given our standard of review, which requires that we indulge in every legitimate inference that may be drawn in support of the judgment, we must conclude that the evidence was sufficient to allow the jury to conclude that Dylan posed a clear and present danger to himself when he left campus that morning.
AES claims that if we take this view of the evidence, we must conclude that Dylan was always a clear and present danger to himself, a conclusion that would do violence to the Education Code sections and regulation cited above. Again, we disagree. Because we have a record, we need not speculate about what might have been. The record shows that Dylan reported having failed to take his medication, and that within an hour prior to leaving campus, he engaged in an act of self-mutilation. We do not believe that it was patently unreasonable for the jury to have concluded that given the school's knowledge of Dylan's history of suicidal ideation, his reporting that he failed to take his medication, and his act of self-mutilation, AES should have concluded that Dylan posed a danger to himself if left unattended and therefore should have attempted to physically restrain him, or called the authorities for that purpose.

3. AES's Negligence Did Not Cause Dylan's Death

Along these same lines, AES argues that there is no evidence in the record to support a finding that a causal link existed between any negligent act that AES was shown to have committed and Dylan's suicide, a required element of the negligence cause of action. (Saelzler v. Advanced Group 400 (2001) 25 Cal.4th 763, 772, 107 Cal.Rptr.2d 617, 23 P.3d 1143.) According to AES, Allison had the burden of establishing both that its failure to prevent Dylan from leaving campus caused him to be sexually assaulted, and that the sexual assault caused Dylan to take his own life almost four months later. It urges that she cannot prove the first of these requirements, both because the sexual assault was an intervening superseding cause of Dylan's death and because it was unforeseeable as a matter of law that Dylan would be sexually assaulted when he left the school campus.
Both of these issues essentially revolve around the question of foreseeability. "Causation in the law of negligence is not determined by a linear projection from a `but for' premise. Instead, it is expressed in terms of `foreseeability' ...." (Brewer v. Teano (1995) 40 Cal.App.4th 1024, 1030, 47 Cal.Rptr.2d 348 (Brewer).) Keeping in mind that a school does have a duty to supervise its students and to take reasonable steps to provide for their safety, the law does not impose a duty upon a school to protect a student from a sexual assault unless that assault was foreseeable. (Leger v. Stockton Unified School Dist. (1988) 202 Cal.App.3d 1448, 1459, 249 Cal. Rptr. 688.) Foreseeability in terms of determining whether or not a duty of care exists is a question of law to be determined by the courts. (Brewer, supra, 40 Cal. App.4th at p. 1030, 47 Cal.Rptr.2d 348.) In that regard, "`a court's taskin determining "duty"is not to decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more *615 generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.'" (Ibid., italics in original.) These policy considerations underlie the interplay of intervening and supervening causes. (Ibid.)
According to the Restatement Second of Torts, "`[a]n intervening force is one which actively operates in producing harm to another after the actor's negligent act or omission has been committed.' [Citation.] Whether it prevents an actor's antecedent negligence from being a legal cause of harm to another is determined by other rules [citation], chiefly those governing the related concept of superseding cause. [¶] `A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.' [Citation.] If the cause is superseding, it relieves the actor from liability whether or not that person's negligence was a substantial factor in bringing about the harm." (Brewer, supra, 40 Cal. App.4th at pp. 1030-1031, 47 Cal.Rptr.2d 348.)
"The following considerations are of importance in determining whether an intervening force is a superseding cause of harm to another: [¶] (a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence; [¶] (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation; [¶] (c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation; [¶] (d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act; [¶] (e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him; [¶] (f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion." (Rest.2d Torts, § 442.) In assessing how these considerations relate to the foreseeability analysis, Bernard Witkin observed: "It is usually said that if the risk of injury might have been reasonably foreseen, the defendant is liable, but that if the independent intervening act is highly unusual or extraordinary, not reasonably likely to happen and hence not foreseeable, it is a superseding cause, and the defendant is not liable. [Citations.]" (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 975, p. 366, italics in original.)
In the instant case then, the question becomes, assuming that AES was negligent in allowing Dylan to leave campus without supervision, whether the risk that Dylan would be sexually assaulted as a result might have been reasonably foreseen.[3] In a similar fashion to the plaintiffs *616 in Wiener v. Southcoast Childcare Centers, Inc. (2004) 32 Cal.4th 1138, 12 Cal.Rptr.3d 615, 88 P.3d 517 (Wiener), Allison argues that the emphasis should not be on the risk of sexual assault, but the risk that Dylan would suffer any kind of harm as a result of AES's allowing him to leave campus unsupervised. (Id. at p. 1144, 12 Cal. Rptr.3d 615, 88 P.3d 517.) That analysis was rejected in favor of one that focused on the criminal nature of the third party's action. (Id. at pp. 1148-1151, 12 Cal. Rptr.3d 615, 88 P.3d 517.) It is the injury suffered, not the mechanism of injury that is important. (6 Witkin, Summary of Cal. Law, supra, Torts § 976, pp. 367-368.) Other case law also requires a focus on the type of injury suffered. (Akins v. County of Sonoma (1967) 67 Cal.2d 185, 199, 60 Cal.Rptr. 499, 430 P.2d 57; Romero v. Superior Court (2001) 89 Cal.App.4th 1068, 1092-1094, 107 Cal.Rptr.2d 801; Robison v. Six Flags Theme Parks Inc. (1998) 64 Cal.App.4th 1294, 1298-1299, 75 Cal. Rptr.2d 838.) From these authorities we conclude that in this case the type of harm/injury that must be foreseeable is the risk of sexual assault. Allison argued in favor of this interpretation of the law below.
Allison also cites Hoyem v. Manhattan Beach City Sch. Dist. (1978) 22 Cal.3d 508, 150 Cal.Rptr. 1, 585 P.2d 851 (Hoyem) for the proposition that AES should be held liable for any injury that Dylan suffered once it allowed him to leave campus unsupervised. That case can be read out of context to state that if a jury finds an absence of reasonable care in supervising the student while on campus, thus allowing a truant to leave the grounds, the school may be liable for any injury sustained by the student. (Id. at p. 519, 150 Cal.Rptr. 1, 585 P.2d 851.) However, the Hoyem court, in considering the issue of foreseeability, agreed with well-accepted principles of tort law, that a duty only extends to prevent reasonably foreseeable harms. (Id. at pp. 520-521, fn. 6, 150 Cal.Rptr. 1, 585 P.2d 851.) Thus, the school's duty of supervision on campus extended only to preventing those types of harms that might reasonably result from a failure to reasonably exercise such supervision. In Hoyem, the risk of harm was being struck by a negligent motorist while truant. The Supreme Court concluded that such an event was not unforeseeable as a matter of law. (Id. at p. 521, 150 Cal.Rptr. 1, 585 P.2d 851.) As we will explain, the risk of falling victim to a child molester during truancy, while conceivable, is not foreseeable as a matter of law absent some actual prior knowledge that such a crime is likely to occur in the absence of supervision. Thus, the facts of this case distinguish it from Hoyem.
Cases involving liability for the criminal, as opposed to merely negligent, acts of third parties require a heightened degree of foreseeability. (Wiener, supra, *617 32 Cal.4th at pp. 1149-1150, 12 Cal.Rptr.3d 615, 88 P.3d 517.) "There are two reasons for this: first, it is difficult if not impossible in today's society to predict when a criminal might strike. Also, if a criminal decides on a particular goal or victim, it is extremely difficult to remove his every means for achieving that goal." (Id. at p. 1150, 12 Cal.Rptr.3d 615, 88 P.3d 517.) Thus, for example, in cases involving landowners' failure to protect against criminal acts, it has been held that "`[t]he burden of requiring a landlord to protect against crime everywhere has been considered too great in comparison with the foreseeability of crime occurring at a particular location to justify imposing an omnibus duty on landowners to control crime.' [Citation.]" (Ibid.) Allison attempts to distinguish Wiener, and the cases upon which it relies, as involving the need for increased security against third party criminal acts on premises, which she claims is not at issue here. We are not persuaded. While she does not assert premises liability, in essence, Allison's claim against AES is based upon her contention that it should have provided a level of security for Dylan higher than that afforded. And, the basic elements of tort liability are the same so long as the defendant is accused of negligence. Thus, cases dealing with landowner liability provide pertinent foreseeability analysis.
The standard for foreseeability has been further heightened where sexual assaults are specifically concerned. In cases involving an employer's vicarious liability for sexual assaults, it has almost universally been held that sexual assaults are not so foreseeable as a part of modern society that an employer should be vicariously liable for such criminal actions taken by an employee against another. (Juarez v. Boy Scouts of America, Inc. (2000) 81 Cal.App.4th 377, 394, 97 Cal.Rptr.2d 12, (Juarez) and cases cited therein.) Further, and more on point, in cases involving third party liability for sexual assaults committed by others, it has been held that, even where a special relationship exists, such as a school has with its students (Rodriguez v. Inglewood Unified School Dist. (1986) 186 Cal.App.3d 707, 714-715, 230 Cal.Rptr. 823 (Rodriguez)), a party to that relationship owes a duty of supervision to prevent a third party sexual assault on the other party to that relationship only if the first party has actual prior knowledge, and therefore must have known, that the third party posed a risk of sexual assault. (Romero, supra, 89 Cal.App.4th at pp. 1080-1084, 107 Cal.Rptr.2d 801; Chaney v. Superior Court (1995) 39 Cal. App.4th 152, 157-158, 46 Cal.Rptr.2d 73.)
From a public policy standpoint, we cannot reconcile Allison's position with existing law. If landowners are not held liable for sexual assaults since they are not foreseeable unless they had happened before (Ann M. v. Pacific Plaza Shopping Center (1993) 6 Cal.4th 666, 679-680, 25 Cal.Rptr.2d 137, 863 P.2d 207), how can AES be held liable for the assault on Dylan unless it was aware of prior sexual assaults? In other words, if AES would not have been liable had the molester attacked Dylan on the campus, we find it irreconcilable that it should be held liable for an attack that occurred when Dylan willingly and knowingly left campus, unless it had knowledge of the specific risk. Similarly, if employers are not liable when they bring a victim into direct contact with an employee who is a molester absent some knowledge of the molester's propensities (Juarez, supra, 81 Cal.App.4th at p. 395, 97 Cal.Rptr.2d 12), then AES cannot be held liable for a sexual assault based on a much less direct level of culpability. In other words, if AES would not have been liable for hiring a teacher that molested *618 Dylan, we find it irreconcilable that it should be held liable for merely failing to supervise him such that a molester had access to him when he left campus, unless it had some specific knowledge of the risk. While a school does have a special relationship with its students, which imposes upon it a duty to supervise them so as to maintain their safety (Rodriguez, supra, 186 Cal.App.3d at pp. 714-715, 230 Cal.Rptr. 823), a school is not a guarantor of the safety of its students any more than a parent can guarantee the safety of his or her child. (Hoyem, supra, 22 Cal.3d at p. 513, 150 Cal.Rptr. 1, 585 P.2d 851; Lilley v. Elk Grove Unified School Dist. (1998) 68 Cal.App.4th 939, 945, 80 Cal.Rptr.2d 638.) We see no reason why the former should be held to a higher standard than the latter. (See, e.g., Hoff v. Vacaville Unified School Dist. (1998) 19 Cal.4th 925, 934-935, 80 Cal.Rptr.2d 811, 968 P.2d 522 [schools "`stand in loco parentis, in the place of parents, to their students, with similar powers and responsibilities.'"]; Dailey v. Los Angeles Unified Sch. Dist. (1970) 2 Cal.3d 741, 747, 87 Cal.Rptr. 376, 470 P.2d 360 [standard imposed on school personnel in discharging their supervisory duty of care is that "`which a person of ordinary prudence, charged with [comparable] duties, would exercise under the same circumstances.'"].)
We cannot hold, as Allison suggests, that it is always foreseeable that an unsupervised child, even an emotionally disturbed and impulsive unsupervised child, will be sexually assaulted. Here, the evidence shows that the risk that Dylan would be sexually assaulted was no more foreseeable than the sexual assault of any person at any time. Unlike in Wallace v. Der-Ohanian (1962) 199 Cal.App.2d 141, 147-148, 18 Cal.Rptr. 892 (Wallace), there was no evidence here that AES was aware of any specific danger of molestation to AWOL students, such as migrant laborers or an ex-convict in the immediate vicinity as in that case. Further, the court's conclusion in Wallace, that crimes against children are always foreseeable (id. at p. 146, 18 Cal.Rptr. 892), is an outdated concept which has lost favor in the development of the law, as shown above. The same analysis applies to M.W. v. Panama Buena Vista Union School Dist. (2003) 110 Cal.App.4th 508, 1 Cal.Rptr.3d 673 where a student-on-student sexual assault was held foreseeable because the evidence showed that there was specific knowledge of a risk of assault. (Id. at pp. 519-521, 1 Cal. Rptr.3d 673 (lead opn. of Wiseman, J.), 525, 1 Cal.Rptr.3d 673 (conc. opn. of Harris, Acting P. J.).)
Allison has failed to cite to any evidence in support of the foreseeability that Dylan would be sexually assaulted if he left the campus unattended, nor has our review of the record demonstrated the existence of any such evidence. The fact that Dr. Roybal-Aragon testified that a child who has been victimized once is more likely to be victimized again does not constitute the kind of specific evidence required by the law in order to find sexual assault foreseeable. Because there was no evidence from which it could be concluded that a sexual assault was a foreseeable result of Dylan's AWOL, AES cannot be liable for that assault. Consequently, since the only evidence linking AES's culpability in Dylan's AWOL to his suicide was the occurrence of the sexual assault, AES, which is not liable for the assault, cannot be held liable for the suicide. The causal chain between AES's negligence and Dylan's death not having been demonstrated, the trial court should have granted AES's motion for judgment notwithstanding the verdict as to the first cause of action for wrongful death.

4. AES's Duty to Allison

AES asserts that Allison failed to demonstrate that it was liable to her for *619 negligent infliction of emotional distress due to the absence of a duty to her and the lack of evidence of damages. In order for AES to be liable to Allison for negligent infliction of emotional distress it must have had a duty to her as a direct victim of its negligence. (Huggins v. Longs Drug Stores California, Inc. (1993) 6 Cal.4th 124, 129, 24 Cal.Rptr.2d 587, 862 P.2d 148 (Huggins).) Direct victim liability "arises from the breach of a duty that is [(1)] assumed by the defendant or [(2)] imposed on the defendant as a matter of law, or [(3)] that arises out of the defendant's preexisting relationship with the plaintiff [citations]." (Id. at pp. 129-130, 24 Cal. Rptr.2d 587, 862 P.2d 148.)
Allison claims that AES had a duty to her to notify her both that Dylan asserted that he had not taken his medication and that Dylan sewed his fingertips together on the morning before he went AWOL, so that she would have had the option to take some action on Dylan's behalf.[4] We note that Allison defines this duty very narrowly, both in that she claims it encompassed only these two incidents, which became potentially consequential only in hindsight, and in that she claims that she should have been notified of these events immediately (the evidence is that AES knew that Dylan claimed that he did not take his medication and of his sewing his fingers together less than one hour before he went AWOL). Allison does not claim that a duty existed to immediately inform her of every claim Dylan made or of every acting-out behavior in which Dylan engaged, or even of every incident where a report was filled out by the AES school staff. Nor does she claim to have sustained emotional distress upon learning of incident reports involving Dylan's behavior on days other than that on which he went AWOL and disappeared for three days. Of note, Allison never testified that she would have taken any steps at all, even if she had been notified of these incidents. (Compare Phyllis P. v. Superior Court (1986) 183 Cal.App.3d 1193, 1196, 228 Cal. Rptr. 776 (Phyllis P.) [mother stated she would have taken precautionary measures had school given her information].) We query whether, if Dylan had not gone AWOL, and had not subsequently disappeared for three days, Allison would be making a claim for negligence against AES for its failure to notify her of his actions that morning.
Of the three options listed in Huggins, the sole ground upon which Allison bases her claim that AES owed her this duty to inform is the case of Phyllis P., supra, 183 Cal.App.3d 1193, 228 Cal.Rptr. 776, which held that a school has a special relationship both to the student and the parent. (Id. at p. 1196, 228 Cal.Rptr. 776.) That *620 relationship imposed upon the school a duty to inform the parent that her child had been the victim of sexual assaults by another student so that she could take steps to protect her child's safety in the future. (Ibid.) In that case the school had concealed from the parent the fact that the child reported having been repeatedly molested by a fellow student, as well as the fact that it had instituted a program of psychological counseling for the victim. (Id. at pp. 1195-1196, 228 Cal.Rptr. 776.)
Phyllis P. relied in part upon Johnson v. County of Los Angeles (1983) 143 Cal. App.3d 298, 191 Cal.Rptr. 704 (Johnson). In Johnson, the wife and daughter of a schizophrenic who committed suicide sued the sheriff's department for releasing him from custody without telling them first. (Id. at p. 304, 191 Cal.Rptr. 704.) The case concerned whether the wife and daughter could state a cause of action for wrongful death (not negligent infliction of emotional distress as claimed by the court in Phyllis P., supra, 183 Cal.App.3d at pp. 1195-1196, 228 Cal.Rptr. 776) and the issue of duty that was of concern was the issue of duty to warn. (Johnson, supra, 143 Cal.App.3d at pp. 304, 311, 191 Cal. Rptr. 704.) The analysis concludes that the defendant had a special relationship with and owed a duty to the decedent husband because it knew that he posed a significant threat of danger to himself. The court then concluded that the sheriff should have exercised this duty to the decedent by "warning" his wife and child of the decedent's release because they were foreseeable victims of the suicide. (Ibid.) As the court earlier stated, "since Respondents were aware of Decedent's suicidal tendencies, their failure to warn Appellants of Decedent's impending release constituted a breach of Respondents' duty to exercise reasonable care to protect Decedent." (Id. at p. 307, 191 Cal.Rptr. 704, italics in original.) Thus, while the court concluded that the sheriff had a special relationship with the wife and daughter, the duty to warn them was based solely on the duty of care owed to the decedent husband, making it questionable whether they were direct victims as that term is currently understood. Further, the court's reliance on the fact that the wife and daughter were foreseeable victims of the suicide to establish a duty of care for direct victim liability has been called into question by the subsequent development of the law.
In Molien v. Kaiser Foundation Hospitals (1980) 27 Cal.3d 916, 167 Cal.Rptr. 831, 616 P.2d 813 (Molien), decided prior to Johnson and also relied upon by Phyllis P., supra, 183 Cal.App.3d at pp. 1196-1197, 228 Cal.Rptr. 776, the Supreme Court concluded that a defendant could be liable for negligently inflicting emotional distress on any victim whose injury was a reasonably foreseeable result of the defendant's conduct. (Molien, supra, 27 Cal.3d at p. 923, 167 Cal.Rptr. 831, 616 P.2d 813.) Since that time, Molien's emphasis on foreseeability as the basis for direct victim emotional distress liability has been severely restricted if not disapproved. (Huggins, supra, 6 Cal.4th at p. 130, 24 Cal.Rptr.2d 587, 862 P.2d 148; Burgess v. Superior Court (1992) 2 Cal.4th 1064, 1074, 9 Cal.Rptr.2d 615, 831 P.2d 1197 (Burgess); Thing v. La Chusa (1989) 48 Cal.3d 644, 663-664, 257 Cal.Rptr. 865, 771 P.2d 814; Lawson v. Management Activities, Inc. (1999) 69 Cal.App.4th 652, 656, fn. 4, 81 Cal.Rptr.2d 745.)
Phyllis P. contains no analysis of duty other than its reliance on Johnson and Molien. The only basis that it provides for its conclusion that the school owed a duty of care to the parent was the fact that the school should have reasonably foreseen that failing to inform her that her daughter had been sexually assaulted would cause her emotional distress. (Phyllis P., *621 supra, 183 Cal.App.3d at pp. 1196-1197, 228 Cal.Rptr. 776.) As we have seen, this basis for duty is no longer acceptable.
Phyllis P. could also be read to find a duty to the parent existed because the child was in the school's care and stood in loco parentis. (Phyllis P., supra, 183 Cal. App.3d at p. 1196, 228 Cal.Rptr. 776.) However, we cannot discern how this might be different from the situation where a child is placed into a doctor's care, under which circumstance no direct victim liability to the parent has been imposed. (Huggins, supra, 6 Cal.4th at pp. 131-132, 24 Cal.Rptr.2d 587, 862 P.2d 148.) In such a situation the duty is owed to the child to keep the child safe from harm. The emotional distress of the parent is a consequence of the negligently caused harm to the child, and is not concomitant therewith. The parent is not the direct victim. The sum total of this discussion is that Allison's reliance on Phyllis P. is misplaced. It cannot be read to impose a duty, as a matter of law, on AES to inform Allison of every claim made by, or acting-out episode engaged in by, her emotionally disturbed son.
Other than the documentation that we discussed in footnote four above, Allison presented no evidence that AES assumed any duty to inform her of Dylan's claims or behavior. And, as we have noted, the only basis for her claim that such a duty existed as a matter of law was the Phyllis P. case. Finally, other than her allegation that AES owed her a duty to supervise Dylan because he was a student at its school, which we have found unpersuasive, Allison presented no evidence or argument that she had any preexisting relationship with AES such that it had a duty to her as opposed to a duty to Dylan. (Compare Burgess, supra, 2 Cal.4th at pp. 1075-1076, 9 Cal.Rptr.2d 615, 831 P.2d 1197 [doctor's preexisting relationship with pregnant mother gave rise to duty to mother to avoid injuring the child during birth]; Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc. (1989) 48 Cal.3d 583, 591, 257 Cal.Rptr. 98, 770 P.2d 278 [therapist's preexisting relationship with mother as a participant in family therapy gave rise to duty to mother to avoid abusing the child].) Thus, she failed to provide any basis for a duty owed to her by AES.
Further, it does not appear from the record that Allison demonstrated the existence of any injury to her as a result of AES's failure to notify her of Dylan's claim not to have taken his medication or of his sewing his fingertips together.[5] Even if Allison had established that AES had a duty to inform her of these occurrences, she did not testify regarding any distress that she experienced upon learning that the school had not notified her of those events. She points to portions of her testimony at trial in support of her distress, but that testimony establishes that she was distressed over Dylan's AWOL, disappearance, rape, and its aftermath. In other words her distress resulted, not from AES's failure to notify her that Dylan claimed that he had not taken his medicine or that Dylan had sewn his fingers together, but rather from AES's failure to adequately supervise and care for Dylan. As we have explained, AES's duty in that regard was owed to Dylan, not Allison, and she may not recover emotional distress damages therefor. Thus, she has failed to demonstrate the existence of damages flowing from the *622 breach of a duty owed to her, a required element of her cause of action for negligent infliction of emotional distress. (Huggins, supra, 6 Cal.4th at p. 129, 24 Cal.Rptr.2d 587, 862 P.2d 148.) The trial court should also have granted AES's motion for judgment notwithstanding the verdict as to Allison's second cause of action for negligent infliction of emotional distress.

B. Motion For New Trial

Given our holding that the trial court erred in failing to grant AES's motion for judgment notwithstanding the verdict, we need not concern ourselves with the propriety of the trial court's having granted the motion for a new trial. Since judgment should have been entered in favor of AES, its motion for a new trial was unnecessary. As a further consequence of our holding, the remaining issues raised by the parties become moot.

DISPOSITION
The order denying AES's motion for judgment notwithstanding the verdict is reversed. Accordingly, the order granting the motion for a new trial is vacated as unnecessary. It is also unnecessary for us to rule on the parties' appeals from the amended judgment, which must be vacated and a new judgment entered in favor of AES. AES is to recover its costs on appeal.
We concur: HOLLENHORST and GAUT, JJ.
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976, 977 and 979).
[1] Allison C. and Dylan C. will hereafter be referred to by their first names, not out of any familiarity or disrespect, but to ease the burden on the reader. (See, e.g., In re Marriage of Schaffer (1999) 69 Cal.App.4th 801, 803, fn. 2, 81 Cal.Rptr.2d 797.)
[2] AES also includes in its cross-appeal a claim that the evidence was insufficient to support the jury's allocation to it of 60 percent of the fault for the injuries. However, that claim was raised below, not in its motion for judgment notwithstanding the verdict, but as a ground for its motion for a new trial. That motion having been granted, albeit on different grounds, we question whether it is properly raised by AES in this appeal. Although it might be considered as a defense to Allison's attack on the order granting a new trial (Code Civ. Proc., § 906), it is not appropriately considered in conjunction with the cross-appeal as it was not raised below in that regard. (Richmond v. Dart Industries, Inc. (1987) 196 Cal.App.3d 869, 874, 242 Cal.Rptr. 184.)
[3] At oral argument Allison insisted that negligence having been established, and this being merely a question of causation, it was an issue for the jury to determine and should not be decided by this court as a matter of law. This argument does not take into account that our discussion of foreseeability is in the context of determining the existence of an intervening superseding cause. As recognized by the Brewer court, the interplay between legal and factual determinations involved in the analysis of foreseeability as related to intervening superseding cause is far from simple. (Brewer, supra, 40 Cal.App.4th at pp. 1030-1037, 47 Cal.Rptr.2d 348.) Ultimately, the question is whether AES can be liable for the consequences of an assault that it had no duty to prevent because it was not foreseeable. "`On its face, the problem is one of whether the defendant is to be held liable for an injury to which the defendant has in fact made a substantial contribution, when it is brought about by a later cause of independent origin, for which the defendant is not responsible. In its essence, however, it becomes again a question of the extent of the defendant's original obligation; and once more the problem is not primarily one of causation at all, since it does not arise until cause in fact is established. It is rather one of the policy as to imposing legal responsibility.' [Citation.]" (Id. at p. 1032, 47 Cal.Rptr.2d 348.) Further, "`[w]hether a defendant's conduct is an actual cause of a plaintiff's harm is a question of fact, but the existence and extent of a defendant's liability is a question of law and social policy.' [Citation.]" (Id. at p. 1035, 47 Cal. Rptr.2d 348.) Therefore, the question of foreseeability with respect to AES's duty to Dylan, which is a question of law (id. at p. 1030, 47 Cal.Rptr.2d 348), is the salient issue to be determined by this court.
[4] While, on appeal, Allison also claims that AES had a duty to her to supervise Dylan, she did not claim that duty as a basis for AES's liability to her in opposition to the motion for judgment notwithstanding the verdict. As such, she may not raise that issue on appeal. (North Coast Business Park v. Nielsen Construction Co. (1993) 17 Cal.App.4th 22, 28-29, 21 Cal.Rptr.2d 104.) While she did argue below, at one point, that certain documents that AES gave her and Dylan to sign reflected its promise to keep him safe and supervised, even if she had not abandoned that point, the law currently provides that a contract between a parent and a provider of services to a child is not enough to give rise to a duty to the parent for purposes of direct victim liability for infliction of emotional distress. (Huggins, supra, 6 Cal.4th at p. 131, 24 Cal.Rptr.2d 587, 862 P.2d 148; Moon v. Guardian Postacute Services, Inc. (2002) 95 Cal.App.4th 1005, 1014-1015, 116 Cal.Rptr.2d 218.) Further, any negligent supervision was directed at Dylan, not at Allison. Consequently, Allison cannot recover for emotional distress resulting from AES's alleged negligent supervision of Dylan. (See, e.g., Steven F. v. Anaheim Union High School Dist. (2003) 112 Cal. App.4th 904, 912, 6 Cal.Rptr.3d 105.)
[5] This argument was made below only tangentially through incorporation by reference of the reply brief filed in the motion for a new trial. However, we believe that was sufficient to present the matter for the trial court's consideration and do not, therefore, find that the issue has been waived for consideration on appeal.